STATE OF CONNECTICUT *v.* BRIAN ELLIS
STATE OF CONNECTICUT *v.* WILMER PARADISE, JR.
(12323)

STATE OF CONNECTICUT *v.* DAVID WORTHINGTON
(12336)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued April 11—decision released September 10, 1985

*John M. Massameno,* assistant state's attorney, with whom, on the brief, were *Austin J. McGuigan,* chief state's attorney, *John M. Bailey,* state's attorney, *Edward Spinella,* former assistant state's attorney, *Linda N. Knight,* deputy assistant state's attorney, *Katherine Lambert,* former deputy assistant state's attorney, and *A. Jeffrey Somers,* legal intern, for the appellant-appellee (state).

*Amy J. Horowitz,* with whom, on the brief, was *Gerald M. Klein,* for the appellee (defendant Brian Ellis).

*Richard R. Brown,* for the appellee (defendant Wilmer Paradise, Jr.).

*Douglas S. Ebenstein,* with whom were *Mark Lever,* legal intern, and, on the brief, *Michael W. Levy,* for the appellant (defendant David Worthington).

DANNEHY, J. This appeal and reserved question present two primary issues: (1) whether the statute of limitations in effect when these offenses occurred imposes a five year limitation on the prosecution of capital felonies; and (2) whether the state must join in a single prosecution all discrete statutory offenses arising from a single criminal transaction.

In May, 1974, the badly decomposed body of seventeen year old Jay Cunningham was found in a heavily wooded area of Enfield. The chief medical examiner classified Cunningham's death as a homicide resulting from multiple stab wounds. More than seven years later, in December, 1981, Wilmer Paradise and Brian Ellis were arrested and charged with murder, General Statutes § 53a-54a, felony murder, General Statutes § 53a-54c, and kidnapping, General Statutes § 53a-92 (a) (2), in connection with Cunningham's death. One month after their arrest, the defendants moved to dismiss the pending charges, claiming that prosecution was barred by General Statutes (Rev. to 1975) § 54-193,[1] which imposed a five year limitation

---

[1] "[General Statutes (Rev. to 1975)] Sec. 54-193. LIMITATION OF PROSECUTIONS FOR VARIOUS OFFENSES. No person shall be prosecuted for treason against this state, or for any crime or misdemeanor of which the punishment is or may be imprisonment in the Connecticut Correctional Institution, Somers, except within five years next after the offense has been committed; nor shall any person be prosecuted for the violation of any penal law, or for other crime or misdemeanor, except crimes punishable by death or imprisonment in the Connecticut Correctional Institution, Somers, but

on the prosecution of any crime of which the punishment "is or may be imprisonment in the Connecticut Correctional Institution, Somers." On March 29, 1982, the trial court, *B. O'Neill, J.,* granted the motions and the state appealed. We found no error. *State* v. *Paradise,* 189 Conn. 346, 456 A.2d 305 (1983) *(Paradise I).*

After our decision in *Paradise I* the state, on April 11, 1983, rearrested Paradise and Ellis on charges of capital felony. General Statutes § 53a-54b (5).[2] Along with them a third defendant, David Worthington, was arrested and charged in connection with the same offense. All three defendants filed motions to dismiss, the hearing of which was postponed pending the action of the grand jury. On June 2, 1983, separate indictments were returned charging each defendant in two counts as principal and accessory to the crime of capital felony. General Statutes §§ 53a-54b (5) and 53a-8. A hearing was then held on the motions to dismiss. Paradise and Ellis claimed, inter alia, that prosecution was barred under principles of res judicata. The trial court, *Borden, J.,* agreed and dismissed the indictments. The state, with leave of the court, appealed. General Statutes § 54-96.

Worthington was not arrested until after our decision in *Paradise I,* and thus did not rely on res judicata

within one year next after the offense has been committed; but, if the person, against whom an indictment, information or complaint for any of said offenses is brought, has fled from and resided out of this state, during the period so limited, it may be brought against him at any time, within such period, during which he resides in this state, after the commission of the offense; and, when any suit, indictment, information or complaint for any crime may be brought within any other time than is limited by this section, it shall be brought within such time."

[2] "[General Statutes] Sec. 53a-54b. CAPITAL FELONY DEFINED. A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety. . . ."

in his motion to dismiss. Rather, Worthington argued that General Statutes (Rev. to 1975) § 54-193 bars prosecution for capital felony unless commenced within five years from the date of the offense. The trial court, *Borden, J.,* denied the motion. Because the denial of a motion to dismiss is not a final judgment; see *State v. Curcio,* 191 Conn. 27, 30–31, 463 A.2d 566 (1983); Worthington's claim was reserved for our advice in accordance with Practice Book § 3133.[3] Paradise makes the identical claim as an alternative ground upon which the judgment dismissing the indictment against him may be affirmed. Practice Book § 3012 (a). We turn to the question reserved first.

## I

## A

The defendants are charged with capital felony, a crime which under our law is punishable either by death or imprisonment, as determined in postconviction proceedings held in accordance with General Statutes § 53a-46a. Because the offense with which they are

---

[3]"[Practice Book] Sec. 3133. WHEN ENTERTAINED

"The supreme court will not entertain a reservation for its advice upon questions of law arising in an action which is not ready for final judgment, unless the question or questions presented are such as are, in the opinion of the court, reasonably certain to enter into the decision of the case, and it appears that their present determination would be in the interest of simplicity, directness and economy of judicial action.

"All questions presented for advice shall be specific and shall be phrased so as to require a Yes or No answer.

"A reservation shall be taken to the supreme court from those cases in which an appeal could have been taken directly to the supreme court had judgment been rendered. Reservations in cases where the proper court for the appeal cannot be determined prior to judgment shall also be taken directly to the supreme court. The advice of the appellate court on a reservation may be reviewed by the supreme court only upon the granting of certification as provided in chapter 55."

The question upon which advice is desired is as follows: "Is the prosecution of [the] defendant Worthington barred by the statute of limitations which was in effect in 1974, C.G.S. § 54-193?"

charged occurred more than five years before the date of their arrest, the defendants claim that their prosecutions are barred by the applicable statute of limitations. That statute provided in pertinent part: "No person shall be prosecuted . . . for any crime or misdemeanor of which the punishment is or may be imprisonment in the Connecticut Correctional Institution, Somers, except within five years next after the offense has been committed; nor shall any person be prosecuted for the violation of any penal law, or for other crime or misdemeanor, except crimes punishable by death or imprisonment in the Connecticut Correctional Institution, Somers, but within one year next after the offense has been committed. . . . " General Statutes (Rev. to 1975) § 54-193.

The defendants claim that the first clause of this statute, imposing a five year limitation on the prosecution of any crime "of which the punishment is or may be imprisonment" in Somers, includes the crime of capital felony. They base this argument on the fact that capital felony "may be" punished by imprisonment in Somers if the death penalty is not imposed. The state argues that while capital felony may be punished by imprisonment, it may also be punished by death. Since the statute does not by its terms limit the prosecution of crimes which may be punished by death, the state contends that it does not apply to the crime of capital felony. Thus, the issue is whether capital felony, for purposes of classification within the statute of limitations, is a crime punishable by death, to which the statute does not apply, or a crime punishable by imprisonment, and thereby subject to the five year limitation period of the statute's first clause.

The statute of limitations presently before us traces its origin to the statute of 1821. General Statutes (1821

Rev.) tit. 59, § 11.[4] Then, as now, crimes were classi-
fied according to their punishments. While the pun-
ishment of crime and the criminal law itself have
changed significantly since 1821, the language and
structure of our limitations statute remains substan-
tially the same. The statute remained workable in its
original form because, until recently, that form was
literally consistent with the punishment schemes upon
which it is made to depend. In 1951, however, the legis-
lature ameliorated the punishment for first degree mur-
der. Public Acts 1951, No. 369. Prior to that time,
conviction for first degree murder carried a mandatory
sentence of death. General Statutes (1949 Rev.) § 8351.
The 1951 act empowered the jury to recommend
upon conviction that the defendant receive a nonpar-
donable sentence of life imprisonment. *State* v. *Walters*,
145 Conn. 60, 71, 138 A.2d 786, cert. denied, 358 U.S.
46, 79 S. Ct. 70, 3 L. Ed. 2d 45 (1958). Thus, for
the first time, the legislature prescribed a punishment
which was not literally classifiable under our statute
of limitations.

The defendants' initial claim is that we may not con-
strue this statute at all. They assert that the statutory
language is plain and unambiguous, and not open to
interpretation beyond the literal meaning of the words
used. *Doe* v. *Manson*, 183 Conn. 183, 186, 438 A.2d 859
(1981). According to the defendants, the first clause

---

[4] "[General Statutes (1821 Rev.) tit. 59] Sect. 11. No person shall be
indicted, informed against, complained of, or in any way prosecuted, before
any court, for treason against this state, or for any crime or misdemeanor,
whereof the punishment is, or may be, imprisonment in new-gate prison,
unless the indictment, presentment, or complaint be made and exhibited
within three years, next after the offence shall have been committed: nor
shall any person be indicted, informed against, complained of, or in any
way prosecuted, before any court, for the breach of any penal law, or for
other crime or misdemeanor, excepting crimes punishable by death, or
imprisonment in new-gate prison, unless the indictment, presentment, infor-
mation or complaint, be made and exhibited within one year next after the
offence shall have been committed. . . ."

of the statute creates a five year bar to prosecution of all crimes potentially punishable by imprisonment in Somers. This description would include all felonies, including capital felony. The second clause is claimed to include all crimes except those included in the first, and "those punishable *only* by death." (Emphasis added.) The defendants recognize that unless the phrase "crimes punishable by death" is construed to mean "crimes punishable *only* by death," the phrase becomes surplusage in the statute. This is because under our law, the phrase "crimes punishable by imprisonment" necessarily includes all crimes punishable by death. We note, however, that our present penal code contains no crimes punishable only by death, nor has it since 1951.[5]

The early common law did not limit felony prosecutions of any kind; 1 Wharton, Criminal Law (14th Ed. Torcia) § 19; Bishop, Statutory Crimes (3d Ed. 1901) § 257; and Connecticut's earliest statutes of limitation expressly excluded from their operation prosecutions for capital and most other felonies. Laws of Connecticut Colony (1672 Rev.) p. 34; General Statutes (1808 Rev.) tit. 101, c. 1, §§ 1, 2.[6] The comments to the

---

[5] One crime, treason, did remain punishable by death after 1951. However, since treason is specifically denominated in the first clause of the statute; see footnote 1, supra; it would have been unnecessary to exclude it from the second clause as a "crime punishable by death." Furthermore, there are no reported convictions under the treason statute, which provided: "Any person who shall commit treason against this state by levying war against it or by adhering to its enemies, giving them aid and comfort, shall suffer death." General Statutes (1949 Rev.) § 8342; see also Conn. Const., art. IX § 4. In 1969 treason was reconstituted and renamed "criminal advocacy," a class D felony punishable by imprisonment in Somers. General Statutes (Rev. to 1971) § 53a-179.

[6] The statutes of limitations enacted between 1672 and 1808 were identical in all material respects. The 1808 version provides in pertinent part: "[General Statutes (1808 Rev.) tit. 101, c. 1] § 1. *Be it enacted by the Governour and Council and House of Representatives in General Court assembled,* That no person shall be indicted, prosecuted, informed against, complained of, or compelled to answer before any court, assistant or justice of the peace within this state, for the breach of any penal law, or for

predecessor of our present statute of limitations indicate that it, too, was intended to exclude capital prosecutions. General Statutes (1821 Rev.) tit. 59, § 11, p. 312 n.2.[7] Since " '[n]o statute is to be construed as altering the common law, farther than its words import' "; *Dennis* v. *Shaw*, 137 Conn. 450, 452, 78 A.2d 691 (1951); the failure specifically to limit prosecutions of crimes punishable by death leads the state to conclude that the statute does not apply to prosecution of capital felony.

other crime or misdemeanor, by reason whereof a forfeiture belongs to any public treasury, unless the indictment, presentment information, or complaint be made and exhibited within one year after the offence is committed. . . .

"§ 2. . . . *Provided always,* That this act shall not extend to any capital offence; nor to any crime that may concern loss of member, or banishment, or any treachery against this state, nor to any pilfering and theft, the value whereof is above *one dollar and sixty-seven cents* . . . ." (Emphasis in original.)

The pre-1821 statutes limited prosecution of only those crimes whose punishment involved a "forfeiture" to the public treasury. At early common law most felonies involved, in addition to death, a complete forfeiture to the King of one's entire estate, real and personal. Clark, Criminal Law (3d Ed. 1915) § 9, p. 42; 1 Wharton, American Criminal Law (1861) § 2. The colonists considered this unjust and "were satisfied with punishing the offender without extending the punishment to his innocent family, and adding to their misfortunes, by plunging them into poverty." 1 Swift, A System of the Laws of the State of Connecticut (1795) pp. 339–40. By as early as 1796, forfeiture of land and chattels had been eliminated as punishment for all crimes except wilful burning of military stores; General Statutes (1808 Rev.) tit. 66, c. 1, § 4; and manslaughter. Id., c. 7; 1 Swift, supra, p. 340. Thus, the statute of limitations applied only to these two crimes, in addition to the numerous petty offenses of which punishment by monetary forfeiture, or *fine,* was customary. See General Statutes (1808 Rev.) tit. 80, c. 1, § 1 (gaming: fine of $3.34); id., tit. 52 (drunkenness: fine of $1.34); id., tit. 53, § 1 (duelling: fine of $3000). The more serious offenses, e.g., robbery or murder, were punished by imprisonment or death, but involved no forfeiture of land, chattels, or money. See General Statutes (1808 Rev.) tit. 66, c. 3, § 1 (robbery); id., c. 5 (murder).

[7] The commentary provided: "In the former statutes, there was no limitation to a prosecution for a crime, unless some forfeiture belonged to a public treasury: but it was thought reasonable that other prosecutions, *where the offence is not capital,* should be limited." (Emphasis added.) General Statutes (1821 Rev.) tit. 59, § 11, p. 312 n.2.

This court does not interpret statutes in a vacuum, nor does it refuse to consider matters of known historical fact. When aid to the meaning of a statute is available, "there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' " *Train* v. *Colorado Public Interest Research Group,* 426 U.S. 1, 10, 96 S. Ct. 1938, 48 L. Ed. 2d 434 (1976), quoting *United States* v. *American Trucking Assn.,* 310 U.S. 534, 543–44, 60 S. Ct. 1059, 84 L. Ed. 2d 1345 (1940). The purpose of statutory construction is to ascertain the intent of the legislature. We first look for that intent in the apparent meaning of the statutory language. *Hayes* v. *Smith,* 194 Conn. 52, 57, 480 A.2d 425 (1984). When the language is unclear, however, the court must ascertain the statute's meaning by considering "its history, its language, the purpose it is designed to serve and the circumstances surrounding its enactment." *Bahre* v. *Hogbloom,* 162 Conn. 549, 554, 295 A.2d 547 (1972). A statute such as this, enacted more than one hundred sixty years ago, cannot meaningfully be interpreted "in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted [it]." *Oliphant* v. *Suquamish Indian Tribe,* 435 U.S. 191, 206, 98 S. Ct. 1011, 55 L. Ed. 2d 209 (1978). And although criminal statutes are strictly construed, it is equally fundamental that the rule of strict construction does not require an interpretation which frustrates an evident legislative intent. *State* v. *Belton,* 190 Conn. 496, 505–506, 461 A.2d 973 (1983); *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983); *State* v. *Sober,* 166 Conn. 81, 91, 347 A.2d 61 (1974).

The court generally presumes the legislature to act "with existing relevant statutes in mind, and with the intention of creating a consistent body of law." *State* v. *Trent,* 182 Conn. 595, 601, 438 A.2d 796 (1981). But this presumption cannot stand when a statute has no

rational meaning with respect to the subject it was designed to govern. We emphasize that rules of statutory construction are often "imprecise and uncertain guides to the legislative intent . . . . Statutory construction is never a mechanical exercise." *Levin-Townsend Computer Corporation* v. *Hartford,* 166 Conn. 405, 411, 349 A.2d 853 (1974).

## B

The 1821 statute of limitations provided in pertinent part: "No person shall be . . . prosecuted . . . for any crime . . . whereof the punishment is, or may be, imprisonment in new-gate prison, unless the . . . complaint be made . . . within three years, next after the offence shall have been committed: nor shall any person be . . . prosecuted . . . for other crime . . . excepting crimes punishable by death, or imprisonment in new-gate prison, unless the . . . complaint, be made and exhibited within one year next after the offence shall have been committed." General Statutes (1821 Rev.) tit. 59, § 11. The statute expressly defines three categories of crimes. The first includes all crimes "whereof the punishment *is* . . . imprisonment in new-gate prison." (Emphasis added.) The second category includes all crimes "whereof the punishment . . . *may be,* imprisonment in new-gate prison." (Emphasis added.) The third category includes all other crimes "excepting crimes punishable by death, or imprisonment in new-gate prison." By necessary implication the statute also defines a fourth category, crimes punishable only by death.

Prior to 1821, when this statute was first enacted, our penal codes contained no crime which fit the description of the second category. Punishments were prescribed by statute, and the sentencing court had no discretion as to *where* a sentence would be served. A crime punishable by imprisonment in Newgate prison

was punishable by imprisonment at that place *and nowhere else.*[8] Jails, or "common gaols," as they were then called, were used primarily to house civil debtors and pretrial detainees.[9] Crimes punishable by death were punishable only by death. And crimes not punish-

---

[8] For example, the burglary statute provided that "whosoever shall commit burglary . . . shall . . . suffer imprisonment in New-Gate Prison, and there be kept to hard labor, for a term not exceeding three years . . . ." General Statutes (1808 Rev.) tit. 66, c. 3, § 1. It was not until 1881 that sentences to state prison for less than one year were prohibited. Public Acts 1881, c. 123; *State* v. *Eckart,* 127 Conn. 719, 720, 18 A.2d 366 (1941); cf. General Statutes § 54-92a ("punishment by imprisonment . . . shall be by commitment to the custody of the commissioner of correction in such institution or facility . . . as he determines"). In 1808, a sentence of imprisonment upon conviction of burglary, no matter how short, had to be served in Newgate prison.

[9] See General Statutes (1808 Rev.) tit. 13, c. 1, § 1 (imprisonment for debt); id., tit. 16, c. 2 (pretrial detention). Imprisonment in a "common gaol" did not become standard punishment until 1821. Prior to 1787, "the various crimes, not capital, were punished by branding, cropping, setting in the pillory, whipping, fine and imprisonment. In 1787, the punishment of almost all crimes by imprisonment in new-gate was introduced." General Statutes (1821 Rev.) tit. 22, § 118, p. 177 n.5. While the "gaols" were used as a place of punishment for some offenses, e.g., the making of fraudulent conveyances; General Statutes (1808 Rev.) tit. 76, § 2 ("half a year's imprisonment without bail"); they were more commonly used to enforce financial or other obligations. An individual could be jailed for failure to pay a fine; id., tit. 69, § 1; or for refusal to give "security for the peace, or good behavior." Id., tit. 125, c. 1, § 5. Women convicted of crimes punishable by imprisonment in Newgate were also confined, separately, in the "common gaols." Id., tit. 66, c. 3, § 9.

The rules applicable to imprisoned debtors are set out in title 86 of the 1808 General Statutes. Upon taking an oath of poverty, the debtor was allowed to leave unless his creditor paid a weekly maintenance. Id., tit. 81, § 14. The creditor was first given an opportunity to "shew reason, (if any be) why such oath should not be administered." Id., § 11. After his maintenance was expended, the debtor was required to remain in jail for a reasonable time, at least until the next meal. *Fitch* v. *Cook,* 1 Root 285 (1791). The "liberties" of the jail could be extended by court order to include access to the local village; *Lampson* v. *Landon,* 5 Day 506 (1813); but the court, upon notice to the parties, could order the debtor back within the walls of the jail. General Statutes (1808 Rev.) tit. 81, § 20. Debtors and criminals could not be lodged in the same room; id., § 17; and the county was liable to the creditor if the debtor escaped. *Williams* v. *County of New Haven,* 2 Root 23 (1793).

able by death or imprisonment in Newgate prison—generally, but not always,[10] the petty offenses—were punishable by forfeiture and a variety of corporal and other punishments.[11] The system of punishment as it existed just prior to the enactment of the 1821 General Statutes was substantially the same as described by Zephaniah Swift in 1796. "The legislature have aimed to proportion the punishment, to the nature of the offence, and for that purpose have introduced three distinct grades of punishment,—*Death; Confinement to hard labor, and coarse fare: Corporal and pecuniary pains and penalties.* The crimes for which death is the punishment, are treason, murder, rape, the crime against nature, mayhem, and arson, where some life is endangered. Imprisonment in New-Gate is inflicted on robbery, burglary, forgery, counterfeiting, horse-stealing, arson, attempting to commit a rape, perjury, and aiding to escape from New-Gate prison. On all other crimes corporal and pecuniary punishments are inflicted." (Emphasis in original.) 2 Swift, A System of the Laws of the State of Connecticut (1796) p. 296. The three categories of punishment were each mutually exclusive.

The 1821 statutes added a fourth type of punishment to this scheme. In 1821, the crime of manslaughter was made punishable by a term of incarceration "in a common gaol, or in new-gate prison, at the discretion of the court having cognizance of the offense, for a term not exceeding three years, nor less than six months." General Statutes (1821 Rev.) tit. 22, § 4. The prior categories as described by Swift were retained with

---

[10] Manslaughter. See footnote 13, infra.

[11] Blasphemy was punished by whipping, "not exceeding forty stripes, and sitting in the pillory one hour." General Statutes (1808 Rev.) tit. 66, c. 1, § 7. For the crime of concealing the death of a newborn child "which, if it were born alive, would, by law, be a bastard . . . the mother so offending shall be set on the gallows with a rope about her neck for the space of one hour . . . ." Id., c. 6, § 2.

respect to all other crimes. Crimes punishable by death remained, as before, punishable only by death. And while incarceration in a "common gaol" replaced corporal punishment as the punishment for most petty offenses,[12] none of these offenses, except manslaughter, was punishable by imprisonment in Newgate. For the first time, and only with respect to the crime of manslaughter, the sentencing court was given discretion as to the place where the sentence might be served.

The relationship between the 1821 statute of limitations and the unique punishment prescribed for manslaughter is obvious. The first clause of the statute imposed a three year limitation on prosecution of two different types of crimes. It limited prosecution of any crime "whereof the punishment *is* . . . imprisonment in new-gate prison," as well as of those crimes "whereof the punishment . . . *may be,* imprisonment in new-gate prison." (Emphasis added.) The former refers to those crimes the punishment of which was nondiscretionary as to place of confinement. This, of course, describes all crimes which prior to 1821 were punishable at all by imprisonment in Newgate, and all crimes of that category thereafter, with the exception of manslaughter. The latter phrase, crimes "whereof the punishment . . . may be, imprisonment in newgate," described only one crime, and that was manslaughter.

The defendants in the case before us argue that the present crime of capital felony is a crime of which, for purposes of the statute of limitations, the punishment "may be imprisonment" in the Connecticut Correc-

---

[12] Theft of over $4 was punishable by whipping. General Statutes (1821 Rev.) tit. 22, § 42. According to the commentary to the code, "[a]ll punishments that fix a lasting stigma on the person of the offender, except whipping for theft, have been abolished; but as this shameful punishment is peculiarly adapted to the meanness of this prevalent crime, it was thought best to retain it." Id., § 118, p. 177 n.5.

tional Institution at Somers. We believe that this argument depends on the intent behind the language "may be, imprisonment" as used in this statute, and the purpose it was designed to serve. We are not unmindful that this language was drafted long ago. But the statute, as a whole, represents a system, a classification scheme whereby the allowable period of prosecution is related to the gravity of the offense. The separate elements of this statute cannot be read in isolation from each other. Each clause had meaning and purpose when the statute was enacted, and the statute, as a whole, took its place in common understanding. When years later and in reliance on that understanding a legislative enactment is passed which, if read literally, may lead to ambiguity, the court will not lightly choose a construction that thwarts the purpose of the statute and which the statutory language does not require. *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983).

The words "may be, imprisonment" in the 1821 statute of limitations necessarily embraced only the crime of manslaughter. And we find it significant that of the many crimes in the 1821 statutes for which imprisonment in Newgate was the punishment prescribed, only in the case of manslaughter was the sentencing court allowed discretion as to place of confinement.[13] The

---

[13] Prior to 1821, manslaughter was punished by methods which might be described as medieval. The 1808 statute provided that "whatsoever person shall be guilty of the crime of man-slaughter . . . shall forfeit to the public treasury of this state, all the goods and chattels to him or her belonging . . . and be further punished by whipping on the naked body, and be stigmatized, or burnt on the hand with the letter *M,* on a hot iron, and shall also be forever disabled from giving any verdict or evidence in any of the courts within this state." (Emphasis in original.) General Statutes (1808 Rev.) tit. 66, c. 7.

Zephaniah Swift, a leading legal figure of his day, author of several major works on early Connecticut law, and later Chief Justice of this court, inveighed against this barbaric form of punishment: "The dreadful punishment annexed to this crime, must have been dictated by that horror which is universally entertained respecting homocide, without due attention to

statutes had otherwise reserved incarceration in "gaol" for such minor offenses as breach of the peace, breaking windows at night, or the destruction of turnpike property, each of which was punishable by no more than six months incarceration. General Statutes (1821 Rev.) tit. 22, §§ 59, 58, 57. Crimes such as murder, maiming, arson and rape were all punishable by death. Id., §§ 3, 8, 6, 10. Of the "new-gate" offenses, manslaughter was punished more lightly than most in terms of time alone. Assault with intent to kill or rob, and burglary or robbery while armed with a dangerous weapon were punishable by up to life imprisonment. Id., §§ 13, 23. Simple robbery, and fraudulent alteration of a will were punishable by up to seven years. Id., §§ 21, 47. But most significantly, manslaughter was even considered less serious than simple burglary; id., § 22; forgery; id., § 30; counterfeiting; id., § 31; and various other forms of fraud, even though each of these crimes carried the same maximum three year sentence. This is because the term of imprisonment for all of these crimes, except manslaughter, had to be served in Newgate prison.

The significance of the distinction between imprisonment in Newgate and incarceration in a "common gaol"

the circumstances under which it may be committed." 2 Swift, A System of the Laws of the State of Connecticut (1796) p. 307. He argued that the ways of committing manslaughter differed greatly in "criminality" and that "the punishment ought to be varied and proportioned accordingly." Id., p. 306. He concluded that in "this enlightened period, when reason and science have dispelled the gloom of prejudice and superstition, it is to be hoped that the legislature will soon enact more rational and consistent laws on this subject." Id., pp. 307–308.

It is beyond question that the views of Chief Justice Swift proved influential with the legislature. A former legislator himself, he headed the committee appointed by the legislature in 1820 to revise the General Statutes. See Preface to the General Statutes (1821 Rev.). Notably, one of the objects of the legislature in enacting the new criminal code was "to proportion the punishment according to the nature and grade of the crime . . . ." General Statutes (1821 Rev.) tit. 22, § 118, p. 177 n.5.

lies in the fact that under the 1821 punishment scheme, the place of confinement was as much a part of the punishment as its length. Confinement in Newgate differed from that in the common gaols in several important respects. In Newgate the prisoners were kept at hard labor, often in chains, and various forms of punishment were specifically authorized by statute.[14] By contrast, the jails were used primarily to house civil debtors, and individuals convicted of minor offenses. The facilities of the prison itself contributed incalculably to the difference. Newgate was located in the excavations of a former copper mine, with the prisoners confined beneath the earth "in the dreary mansions of a profound cavern, to heighten the horror of the punishment . . . ." 2 Swift, supra, p. 296.[15] The comments to the

[14] "[General Statutes (1821 Rev.) tit. 69] AN ACT CONCERNING NEW-GATE PRISON. . . . Sect. 3. The master or keeper of said prison, shall keep all such persons as have been, or shall be, sent there, by warrant from lawful authority, to such labor as they shall be capable of doing, and as shall be directed by said overseers, for such time as they shall be sentenced to remain therein; and may confine them at their labor, or punish them, by putting fetters and shackles on them, and by moderate whipping, not exceeding ten stripes for any one offence; which punishment may be inflicted, in case they be stubborn or disorderly, or do not well and faithfully perform their task, as they shall be reasonably required, or in case they shall not submit to such rules and orders as shall be, from time to time, established, for the well-ordering and governing of the same." This statute may be contrasted with an analogous provision: "[General Statutes (1821 Rev.) tit. 42] ACT CONCERNING GAOLS AND GAOLERS. . . . Sect. 13. If any keeper of a common gaol, shall do, or cause to be done, to any prisoner committed to his custody, any wrong or injury, contrary to the true intent of this act, he shall pay treble damages to the party aggrieved; and also such fine, not exceeding one hundred dollars, as the county court of the county wherein the offence is committed, shall, upon information or complaint to them made, considering all the circumstances, think fit to impose upon him."

[15] Imprisonment in Newgate was the punishment prescribed for the middle tier of crimes, those less serious than the capital crimes but more serious than those punishable by incarceration in a "common gaol." The depictions of the inner prison reflect prevailing notions about the relative seriousness of different crimes:·

"The passage down the shaft into the caverns, is upon a ladder fastened upon one side, and resting on the bottom. At the foot of this passage com-

1821 criminal code, in comparing Newgate to the penitentiary system employed in other states, noted "that punishments must be attended with considerable severity, to operate as examples to others: and the dread of the caverns of new-gate, has produced a much more powerful and salutary effect, than the humane regulations, adopted in some penitentiaries . . . ." General Statutes (1821 Rev.) tit. 22, § 118, p. 177 n.5.[16]

---

mences a gradual descent for a considerable distance, all around being solid massive rock or ore. . . . In two of the passages are deep wells of water, one of which is eighty feet from the surface; they served for a free circulation of air to the inmates of this gloomy place, and were sometimes used for shafts through which to lift the ore, when the business was carried on. On the sides and niches of the cavern, cabins were built of heavy planks, within which straw was placed for their beds. . . . The horrid gloom of this dungeon can be realized only by those who pass among its solitary windings. The impenetrable vastness supporting the awful mass above, impending as if ready to crush one to atoms: the dripping water trickling like tears from its sides; the unearthly echoes responding to the voice, all conspire to strike the beholder aghast with amazement and horror. . . . During the day the guard was changed once in two hours, at the sound of a horn, and in the night a guard entered the caverns every hour and a half, and counted the prisoners. The punishments inflicted for offences and neglect of duty were severe flogging, confinement in stocks in the dungeon, being fed on bread and water during the time, double or treble sets of irons, hanging by the heels, &c., all tending to inflame their revenge and hatred . . . ." Phelps, Newgate of Connecticut (1876) pp. 59–60, 67.

"Newgate 'embodied in its general management the ideas of the time in which it flourished—harsh mediaeval ideas, with little consideration of the sources of sin, and less sympathy with the sinner.' . . . It was an eighteenth-century philosophy . . . well-suited to 'the happy faculty possessed by the Puritan of that period, of devising places of unearthly punishment to correspond with the future provided in his theology . . . .' " D'Amato, Newgate to Wethersfield: The Development of Prison Reform In Early Nineteenth-Century Connecticut (1972) pp. 9–10 (unpublished masters thesis, Trinity College; Connecticut State Library, Hartford, Connecticut), quoting Start, "The New England Newgate," The New England Magazine, III (N.S.) (November, 1890) pp. 376, 367–68.

[16] In contrast to Newgate, where methods of punishment beyond incarceration itself were officially employed in an effort to deter crime, the county jails were largely unsupervised detention facilities where the incarcerated spent their time awaiting release. As late as 1840, a committee appointed by Windham County officials to assess conditions at the county jail reported

It is clear to us that by including the words "may be, imprisonment" within the first clause of the statute of limitations, the legislature intended to place a relatively less serious crime—manslaughter—in the same limitation period prescribed for relatively more serious crimes, i.e., those for which incarceration in Newgate was mandatory and nondiscretionary. Because the place of confinement was discretionary with respect to punishment of manslaughter, prosecution of that crime was potentially subject to two different limitation periods. By placing the words "may be, imprisonment" in the first clause of the statute, the legislature intended to limit prosecution according to the maximum allowable punishment for the crime in question. The defendants in the case before us claim that these same words require that prosecution for capital felony be limited according to its minimum allowable punishment. We do not believe that the phrase "may be,

that "the jail stands disconnected from the dwelling of the keeper, and is in fact 20 rods distant from the place of his residence, and has been so for years. The keeper does indeed visit the jail as many times in the day as may be essential to feed the prisoners, but his relative position is so far removed from them, that it is utterly impossible that he should have any supervision over the conduct of the prisoners.

"Whatever may be their habits—their plans—or their combinations, the jailor is as much a stranger to them, as if he resided in some other County.

"From this mere position of the jail, the prisoners whether good or bad—whether sick or well—whether cleanly or filthy—whether male or female—whether clothed or naked—whether moral or vicious, once being locked in, are left to themselves, without employment, admonition or reproof. When the door is once closed upon them, they cease to be useful in any business, either for themselves or community, and no one can pretend that the prisoners confined here are ever the subjects of moral culture; and *this* surely is the last place in the County where reformation is, or can be expected.

"The Convention will understand, that the committee do not design, by these remarks, to cast censure upon the present keeper, or any of his predecessors.

"These officers have never been employed for any other purpose except the actual imprisonment and safekeeping of the men. Whatever fault does exist, is to be attributed to the ancient system of legislation, from which, as a people, we have not exercised investigation and energy enough to depart.

imprisonment" should now be interpreted to accomplish the precise opposite of its intended purpose.

The defendants do not dispute that the statute as first enacted was not intended to limit capital prosecutions. They argue, however, that the legislature intended this result in subsequent enactments. Their primary argument in this respect concerns action taken by the 1846 legislature. In 1846 the legislature divided the crime of murder into two degrees. Public Acts 1846, c. 16; *State* v. *Edwards*, 163 Conn. 527, 533, 316 A.2d 387 (1972). The mandatory punishment for murder in the first degree was death, with the punishment for murder in the second degree being mandatory life imprisonment. The defendants contend that since 1846, the "generic" crime of murder has been subject to the first clause of the statute of limitations. We cannot agree that after 1846 murder became a "generic" crime for purposes of the statute of limitations. The power to

"The matter of 'Prison discipline' has been overlooked and considered inapplicable to the counties. The error is here." (Emphasis in original.) Report On the Subject of County Prison Discipline In Common Jails, Brooklyn, Connecticut, December 9, 1840, pp. 4–5.

The composition of the Hartford County jail, even after the 1821 General Statutes had made such incarceration the standard punishment for most minor offenses, is revealed in the following report by the judges of Hartford County to the General Assembly:

"The number of prisoners confined in Hartford County Jail, from June 1827 to March 1835 was 386. For this fact, together with some other important information, we are indebted to Alfred Smith, Esq. who has devoted much time in laudable efforts to ascertain the state of our County Jail, and in endeavors to improve it. 'The major part of these 386 prisoners were detained for trial, and the residue sentenced for minor offences. The average was 50 a year. The time of confinement varied from a few days, to two or three, and rarely six months. The number of debtors brought to Jail during the same period, (seven years and nine months) was 1121, few of whom were confined in the prison but were bailed out and living on the limits.' " Report of the Judges of the Hartford County Court Concerning the Hartford County Jail, May, 1838, p. 7.

We believe that these reports, although not determinative, indicate the general nature of the intended punishment for crimes punishable by incarceration in a "common gaol."

define and differentiate between crimes resides in the legislature, subject to the provisions of our state and federal constitutions. See *Missouri* v. *Hunter,* 459 U.S. 359, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983). The purpose of the 1846 act is stated clearly in its preamble. According to that preamble, murder was divided into degrees because "the several offenses which are included under the general denomination of murder differ so greatly from each other in the degree of their atrociousness that it is unjust to involve them in the same punishment . . . ." Public Acts 1846, c. 16. We believe that the 1846 legislature effectively divided murder into separate crimes for purposes of the statute of limitations.

A more difficult question is raised by legislative action taken in 1951. In 1951 the legislature abrogated the mandatory death penalty for murder in the first degree by empowering the jury to recommend mandatory life imprisonment in its verdict. Public Acts 1951, No. 369; *State* v. *Walters,* 145 Conn. 60, 71, 138 A.2d 786 (1958); see General Statutes (Sup. 1951) § 1406b. The issue is whether the legislature by this action intended to render murder in the first degree a crime no longer punishable by death for purposes of the statute of limitations.

We are unable to discover in the history of Public Acts 1951, No. 369, anything which would indicate a legislative concern with the effect its decision to ameliorate mandatory capital punishment might have on the applicable statute of limitations. As this court noted in *State* v. *Walters,* supra, 73, the effect of the 1951 public act was to remove from the board of pardons the decision whether to grant clemency and to confide it instead in the jury. The unconstitutionality of that act notwithstanding; see *Furman* v. *Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346, reh. denied, 409 U.S. 902, 93 S. Ct. 2726, 33 L. Ed. 2d 346 (1972); we do not believe that the legislature, in abrogating the

mandatory death penalty, intended to reclassify murder in the first degree as a crime not punishable by death. In reaching this conclusion, we are persuaded by the reasoning and analysis of the court in *State* v. *Zarinsky*, 75 N.J. 101, 380 A.2d 685 (1977). That court held that its own decision in a previous case, effectively nullifying the death penalty, did not render the crime of murder an "offense not punishable by death" for purposes of their statute of limitations. It refused to accord significance to the nonpassage of a bill, introduced in the legislature, which would have made clear that capital prosecutions were not limited by the statute. Id., 113. Instead the court chose to "examine individually each legislative enactment affected by the concept of crimes punishable with death" in view of the broader policy goals implicated in the legislative design. Id., 110.

We believe that this approach best comprehends the intent of the legislature when, in 1951, it abrogated mandatory punishment by death. That action reflected a changing attitude not toward murder, but toward capital punishment. Thus, although *Zarinsky* concerned judicial action, we fail to see how legislation specifically addressed to the issue of capital punishment, and only indirectly affecting the statute of limitations, is any better gauge of legislative intent.[17] The concerns

[17] Two bills came before the legislature in 1951. The first, House Bill 1420, would have eliminated completely capital punishment. The second, House Bill 32, became Public Acts 1951, No. 369, abrogating the mandatory death penalty. The summarized hearings before the judiciary committee on these bills indicate clearly and convincingly that reservations about capital punishment directed this legislation:

"Judge Charles Henchel, New Haven: I appear here in connection with House Bill 32 . . . . These bills have been presented by the Legislative Committee. I was present at the meeting of the Legislative Council when the favorable report was accepted. . . . My feeling against capital punishment is predicated upon the belief that the state has no more right to take a life than an individual has. Society cannot have collectively stronger rights than the individual has. . . . I have no pity for the man who commits murder. I am told that when I advocate that when a person go [sic]

addressed by the 1951 legislature with regard to capi-
tal punishment bear no substantive relationship to the
competing interests underlying the statute of limita-
tions.[18] Since 1672, our legislatures have resolved these

to prison without hope of pardon, the punishment I advocate is more hor-
rible than death. At the present time there are 8 states which have done
away with capital punishment. Two of those states amended the law to pro-
vide that if a person so confined should commit another murder, he must
then pay with his life. I make no such compromise. . . . Is the electric
chair a deterrent to murder? I say 'No.' I hope the State of Connecticut
will remove itself from the list of a few states which still have capital pun-
ishment on their statute books.

"Thomas R. Robertson, Attorney, New Haven: This matter has been fully
discussed. There isn't any question in my mind that this question of capi-
tal punishment is well within the rights of the state. . . . I have come in
contact with a great many lifers in my experience. It costs the state some-
thing to keep them. They are put back in almost every instance with improve-
ment as human beings. My experience has been that there would be no harm
coming from the sparing of their lives. I am not quite prepared that we
should substitute a hopeless, irrevocable imprisonment.

"W. T. Holleran, New Haven, member of the bar: I am in favor of a bill
which will abolish capital punishment. I cannot say I am whole-heartedly
in favor of the bill which provides that there shall never be any release to
one who is sentenced to life imprisonment. . . . I do not feel that the impo-
sition of capital punishment is a deterrent to crime. . . . There are only
two states in the union which have a mandatory capital punishment.

"Senator Anthony S. Avallone, 11th District: I had intended to speak
at length on this bill, but in view of the fact that the previous speakers have
spoken at length, I don't think I need to. I think a favorable report should
be handed in on this bill so that this matter can be debated where it should
be debated—in the House and in the Senate. It is my opinion, in view of
what other states have done, there certainly must have been the conclu-
sion that capital punishment is not a deterrent. I think this committee should
bring out a favorable report.

"Representative Milton Reinhard, Jr., Bridgeport: Mr. Robinson [sic],
did you make any statement on the deterrent aspect of capital punishment?

"Mr. Robertson: I don't believe there is any. The person who kills does
it from motives—either from passion or greed, or he feels he is so clever
that he can beat the rap. In New York, where murder executions are almost
the order of the day, there is no deterrent."
Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1951 Sess.,
pp. 419–21.

[18] The statute of limitations strikes a difficult balance between the pub-
lic demand for justice and the right of the individual to be free from the
continual threat of prosecution for past misconduct. The passage of time
may prevent recollection of facts necessary to convict, or hinder the presen-

interests by refusing to grant repose to those accused of capital crimes. It is unlikely that the 1951 legislature intended to alter this deep-rooted understanding. "In the interpretation of a statute, a radical departure from an established policy cannot be implied. It must be expressed in unequivocal language." *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 667, 103 A.2d 535 (1954); *Miller* v. *Colonial Forestry Co.,* 73 Conn. 500, 505, 48 A. 98 (1901); see *McBrien* v. *Warden,* 153 Conn. 320, 332, 216 A.2d 432 (1966).

Finally, in 1976, five years before these defendants were arrested, the legislature amended General Statutes § 54-193 to provide expressly that there "shall be no limitation of time within which a person may be prosecuted for a capital felony or a class A felony." Public Acts 1976, No. 76-35; General Statutes (Rev. to 1977) § 54-193. We recently held in *Paradise I,* supra, that this amendment does not by its terms apply retroactively. That holding does not bear on the question whether the legislature ever intended to place limita-

tation of a proper defense. It is thus intended to encourage diligence on the part of our law enforcement agencies.

These competing interests, however, must be weighed and measured by the legislature, and it has done so through enactment of the statute of limitations. We can perceive in General Statutes (Rev. to 1975) § 54-193 no distinction between crimes for purposes of limiting prosecution other than that which arises from their relative difference in seriousness. The difficulty in gathering evidence of a past robbery or assault is not inherently greater than in gathering evidence of a past capital felony.

Our legislatures have not hesitated to except crimes from normal operation of the statute when it has been thought necessary. The 1808 statute imposed a six month limitation on prosecution of atheism, a crime punishable by disability to hold official office, and because not involving a forfeiture, not otherwise subject to any limitation on prosecution. General Statutes (1808 Rev.) tit. 66, c. 1, §§ 8, 9. Treason, a crime punishable by death until 1969, has always been expressly subject to the first clause of the statute otherwise applicable to crimes punishable by imprisonment. We finally note that although treason *qua* treason ceased to exist after 1969; see footnote 5, supra; it remained in the statute of limitations until its revision in 1976.

tions on capital prosecutions. The sponsor of the amendment stated that its purpose was to clarify the existing law. 19 S. Proc., Pt. 1, 1976 Sess., p. 341 (remarks of Senator David H. Neiditz). We view the amendment and the words of its sponsor as relevant to the determination of whether the statute of limitations was ever intended to apply to capital prosecutions. See *State* v. *One 1977 Buick Automobile,* 196 Conn. 471, 479, 493 A.2d 874 (1985); *Circle Lanes of Fairfield, Inc.* v. *Fay,* 195 Conn. 534, 540–41, 489 A.2d 363 (1985); *Hartford Electric Light Co.* v. *Wethersfield,* 165 Conn. 211, 224, 332 A.2d 83 (1973). We hold that it was not.

The question reserved to us for advice, in accordance with Practice Book § 3133, is: "Is the prosecution of [the] Defendant Worthington barred by the statute of limitations which was in effect in 1974, C.G.S. § 54-193?" The answer is no.

## II

The second issue, pertinent to Paradise and Ellis only, concerns the res judicata effect of our decision in *Paradise I,* supra. Due to the nature of the issues raised under this claim of res judicata, we set out the procedural background of our prior decision to determine the precise scope of its holding.

Paradise and Ellis were arrested in December, 1981, and charged with murder, felony murder and kidnapping in connection with the 1974 death of Jay Cunningham.[19] The trial court dismissed those charges on March 29, 1982. It held that the 1976 amendments

---

[19] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. . . . (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

"[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, arson, rape in the first degree, deviate sexual intercourse in the first degree, sexual contact in the first degree, escape in the first degree, or escape in the second

to the statute of limitations, providing that there be no time limitation on prosecution of capital or class A felonies, "effected a change of substantive law and because it did not expressly provide for retroactive effect was not to be so applied." Id., 350. On the state's appeal to this court, we expressly limited our holding to the "sole issue" of whether the amended statute "is, by its terms, retroactive." Id., 347. We applied settled rules of statutory construction to find that the statute did not apply retroactively, and therefore upheld the judgment of the trial court.

After that decision, the defendants were rearrested on April 11, 1983, and charged with capital felony. General Statutes § 53a-54b (5). That statute provides: "A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety. . . ." The state concedes that the capital felony charges arise out of the same incident and refer to the same victim as did the murder, felony murder and kidnapping charges which had previously been dismissed. The defendants moved to dismiss the capital charges on grounds of res judicata. They claimed that because all charges arose out of the same transaction, the previous dismissal on the merits of the mur-

---

degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

"[General Statutes] Sec. 53a-92. KIDNAPPING IN THE FIRST DEGREE. (a) A person is guilty of kidnapping in the first degree when he abducts another person and when: (1) His intent is to compel a third person to pay or deliver money or property as ransom, or to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function. . . ."

der, felony murder and kidnapping charges precluded the state from bringing these charges anew under the rubric of capital felony.

The trial court agreed and dismissed the charges. Drawing from other decisions of the Superior Court,[20] it reasoned that capital felony is only "a more aggravated form" of the "generic crime of murder," and therefore constitutes the "same" offense as murder. It found significant that the *"elements* of the crimes which the state would have *had* to prove in the first prosecution are essentially the same as those charged" in the capital felony indictments. (Emphasis added.) Relying on our decision in *State* v. *Aillon,* 189 Conn. 416, 456 A.2d 279, cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983) (*Aillon II*), the trial court concluded that "res judicata bars a second prosecution, based on the same transaction as the first, even though there may be some 'slight shift in evidentiary basis and substantive theory of law'; [*Aillon II,* supra, 426]; and even though the second prosecution seeks remedies not demanded in the first prosecution. 1 Restatement (Second), Judgments §§ 19, 24, 25." Because we believe that the trial court misconstrued the doctrine of res judicata as it applies to the criminal process, we find error.

## A

We have had recent occasion to consider the doctrine of res judicata. *In re Juvenile Appeal (83–DE),* 190 Conn. 310, 460 A.2d 1277 (1983); *Aillon II,* supra; *State* v. *Wilson,* 180 Conn. 481, 429 A.2d 931 (1980). In *Aillon II* we stated that under "the doctrine of res judicata, or claim preclusion, a former judgment on a

---

[20] *State* v. *Mercado,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 28523 (August 16, 1982); *State* v. *Castonguay,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 42509 (Memorandum of Decision on Motion to Correct Illegal Sentence) (October 15, 1981).

claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim. A judgment is final not only as to every matter which was offered to sustain the claim, but also as to any other admissible matter which might have been offered for that purpose. *Cromwell* v. *County of Sac,* 94 U.S. 351, 352-53, 24 L. Ed. 195 (1876); 1 Restatement (Second), Judgments §§ 19, 25; James & Hazard, Civil Procedure (2d Ed.) § 11.3." Id., 423-24. And in *In re Juvenile Appeal (83-DE),* supra, 316, we stated that "[c]ollateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim."

We begin our analysis with the observation that the trial court did not invoke the doctrine of collateral estoppel, or issue preclusion, to dismiss the capital felony charges. The only issue actually litigated and decided in *Paradise I* was whether the amended statute of limitations would receive retrospective application, and our resolution of that issue was plainly irrelevant to the question of guilt or innocence with respect to the crime of capital felony. Rather, the trial court's holding rested on language in *Aillon II,* supra, to the effect that a "judgment is final not only as to every matter which was offered to sustain the claim, *but also as to any other admissible matter which might have been offered for that purpose."* (Emphasis added.) Id., 423. Thus, the trial court sought to apply that aspect of res judicata called claim preclusion.

We recognize that the mere explication of the doctrine of claim preclusion does not resolve all difficulties which may appear at the point of application. As was stated long ago, the "law of estoppel by judgment is well settled, the only difficulty being in its application to the facts." *Pelham Hall Co.* v. *Carney,* 27 F.

Sup. 388, 390 (D. Mass. 1939). The difficulty has always been in determining what matters are precluded by the former adjudication. "The rule of claim preclusion prevents reassertion of the same claim even though additional or different evidence or legal theories might be advanced in support of it. In applying the rule of claim preclusion, the critical question is how broad a definition to give to the term 'same claim' or 'cause of action.' The broader the definition, the broader the scope of preclusion." James & Hazard, Civil Procedure (2d Ed.) § 11.7, p. 540;[21] see *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 327, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971).

The related doctrines of claim preclusion and issue preclusion as stated in our cases may seem to imply a meaningful distinction between "claim" and "issue" for purposes of determining what matters are precluded by a former adjudication. If so understood, sound principles of finality are made to depend on the terminology used to express them.[22] The concepts of "issue

[21] The problem of defining the scope of preclusion is no less present in the related doctrine of collateral estoppel, or issue preclusion. For while we have stated that the doctrine of issue preclusion, "unlike that of [claim preclusion], operates to bar only matters actually litigated in the prior action"; *State* v. *Aillon,* 189 Conn. 416, 424 n.8, 456 A.2d 279, cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983) (*Aillon II*); it is clear that other arguments, not raised, that might have influenced resolution of the issue, "actually litigated in the prior action"; id.; may not be raised on a later occasion in an attempt to litigate that issue once again. Thus, even with respect to the doctrine of collateral estoppel, or issue preclusion, "the prior determination of an issue is conclusive in the subsequent action between the parties as to that issue and every matter which might have been urged to sustain or defeat its determination." Polasky, "Collateral Estoppel—Effects of Prior Litigation," 39 Iowa L. Rev. 217, 224 and n.31 (1954). The revised Restatement defines "issue litigated" broadly enough to preclude bringing forth in a later proceeding new evidence or new legal theories which might have been raised in the prior adjudication of that issue. See 1 Restatement (Second), Judgments § 27, comments c and e.

[22] The variability of concepts such as "issue," "claim," and "cause of action" has brought one commentator to suggest that "the time has come to abandon the unhelpful distinction between res judicata and 'collateral

preclusion" and "claim preclusion" are simply related ideas on a continuum, differentiated, perhaps by their breadth, and express no more than the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest. Vestal, Res Judicata/Preclusion (1969) pp. 5–7. "The process of defining the claim . . . is thus aimed at defining the matters that both might and *should* have been advanced in the first litigation." (Emphasis in original.) 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4406, p. 45. The decision whether to apply res judicata to matters "not actually litigated should be made in light of the policies underlying that doctrine— the competing interests 'of the defendant and of the courts in bringing litigation to a close' and 'of the plaintiff in the vindication of a just claim.' " Currie, "Res Judicata: The Neglected Defense," 45 U. Chi. L. Rev. 317, 341 (1978), quoting 1 Restatement (Second), Judgments § 24, comment b, p. 199.

Res judicata, as a judicial doctrine; *Commissioner* v. *Sunnen,* 333 U.S. 591, 597, 68 S. Ct. 715, 92 L. Ed. 898 (1948); should be applied as necessary to promote its underlying purposes. These purposes are generally

---

estoppel' and to ask simply whether the party to be precluded had adequate opportunity to litigate the matter in the earlier proceeding . . . ." Currie, "Res Judicata: The Neglected Defense," 45 U. Chi. L. Rev. 317, 342 (1978). "As useful as the distinction between issue and claim preclusion may be, it is important to note that the distinction . . . is one of emphasis and degree, no more." 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4406, p. 44.

While acknowledging that all of these terms are "in a sense question-begging," Professors James and Hazard note that as a practical matter, some terminology is necessary and that "the current terms seem to be about as good as any." They go on to add, however, that the criticism is "a pointed reminder that these descriptive terms do not themselves furnish the reasons why the unit should be limited by any given boundary, and that these reasons are to be sought in terms of the practical and policy goals which a procedural system should seek to attain, rather than in terms . . . which should be simply the tools of the system." James & Hazard, Civil Procedure (2d Ed.) § 11.8, pp. 542–44.

identified as being "(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harrassed by vexatious litigation." *People* v. *Taylor,* 12 Cal. 3d 686, 695, 527 P.2d 622, 117 Cal. Rptr. 70 (1974); see generally Vestal, supra, pp. 7–12; Wright, Miller & Cooper, supra, § 4403. But by the same token, the internal needs of the judicial system do not outweigh its essential function in providing litigants a legal forum to redress their grievances. "Courts exist for the purpose of trying lawsuits. If the courts are too busy to decide cases fairly and on the merits, something is wrong." Cleary, "Res Judicata Reexamined," 57 Yale L.J. 339, 348 (1948). "The judicial doctrines of res judicata and collateral estoppel are based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate. . . . Stability in judgments grants to parties and others the certainty in the management of their affairs which results when a controversy is finally laid to rest. The doctrines of preclusion, however, should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." (Citations omitted.) *In re Juvenile Appeal (83–DE),* supra, 318.[23]

We review the doctrine of res judicata to emphasize that its purposes must inform the decision to foreclose future litigation. The conservation of judicial resources

---

[23] Thus, the doctrine of res judicata strikes a delicate balance. In promoting stability in judgments, it often "blockades unexplored paths that may lead to truth. For the sake of repose, res judicata shields the fraud and the cheat as well as the honest person. It therefore is to be invoked only after careful inquiry." *Brown* v. *Felsen,* 442 U.S. 127, 132, 99 S. Ct. 2205, 60 L. Ed. 2d 767 (1979).

is of paramount importance as our trial dockets are deluged with new cases daily. We further emphasize that where a party has fully and fairly litigated his claims, he may be barred from future actions on matters not raised in the prior proceeding. But the scope of matters precluded necessarily depends on what has occurred in the former adjudication.

We believe that a careful reading of our prior decisions demonstrates that they fully embody these principles. In *State* v. *Wilson,* 180 Conn. 481, 429 A.2d 731 (1980), the trial court in the defendant's second trial held a suppression hearing with regard to a search whose validity this court had previously upheld in an earlier appeal. On his second appeal, the defendant "sought to avoid the effect of collateral estoppel by arguing that there were significant discrepancies" between the findings on the motions to suppress in the first and second trials. Id., 486. This court refused to review the trial court's findings in the second hearing because the legality of the search had been fully litigated in the first trial: "It would be a violation of the fundamental principles and purposes of collateral estoppel for this court to reexamine the identical factual situation to redetermine a matter of law that has already once been fully litigated by the same parties and finally decided." Id., 487. And in *Aillon II,* supra, 416, the defendant in a previous appeal to this court had argued that his retrial was barred under principles of double jeopardy. See *State* v. *Aillon,* 182 Conn. 124, 438 A.2d 30, cert. denied, 449 U.S. 1090, 101 S. Ct. 883, 66 L. Ed. 2d 817 (1980) (*Aillon I*). The basis of his double jeopardy claim concerned the fact that his two previous trials had ended in mistrials. The defendant raised the same claim in a later appeal, supported, however, by the new argument that his second mistrial had been the result of judicial overreaching. *Aillon II,* supra, 426. We noted that the legal basis for

468

this belated claim—that the trial court's misconduct barred retrial on double jeopardy grounds—had been enunciated long before the defendant's first appeal. In applying the doctrine of finality to this matter we stressed the amount of *actual* litigation that had already occurred: "Two evidentiary hearings have already investigated the incident in question. The trial judge's misconduct has been the basis for a successful motion to set aside the first verdict; it has been the basis for an unsuccessful claim of double jeopardy; it cannot now be the basis for yet a renewed claim of double jeopardy." Id., 428–29.

Our third case considering the extent of matters precluded by a prior judgment provides further elucidation. In *In re Juvenile Appeal (83–DE)*, supra, the plaintiff's action was dismissed for failure to satisfy a statutory precondition to suit. The plaintiff later reinitiated the action after the precondition had been satisfied. In the second action the defendant objected to the admission of any evidence which might have been introduced by the plaintiff in the first action in support of a contention, not made, that compliance with the precondition was unnecessary. Id., 315. In refusing to apply the doctrine of res judicata to this situation, the court reasoned that the mere fact that the plaintiff could have made such arguments "cannot transform a judgment based on [an] ancillary issue . . . into a judgment on the merits" of the underlying claim. Id., 316.

These cases demonstrate that when a party has fully and fairly litigated his claims, he is barred from subsequent relitigation notwithstanding "any other admissible matter which might have been offered" to sustain them in the prior proceeding. *Aillon II*, supra, 423. The difference between *Aillon II* and *Wilson* and the case before us is plain. Not only has the state not litigated its "claims" regarding capital felony, it never even

prosecuted the crimes of murder, felony murder and kidnapping previously charged. The state concedes, and we have no doubt, that those charges were dismissed "on the merits." *United States* v. *Oppenheimer,* 242 U.S. 85, 37 S. Ct. 68, 61 L. Ed. 161 (1916). But a pretrial dismissal, based on the statute of limitations, is not the logical or practical equivalent of a full and fair opportunity to litigate.[24] The judgment in *Paradise I* is an absolute bar to any "issue," "claim," "matter" or "argument" which might now benefit the state in an attempt to relitigate the question of whether the amended statute of limitations applies retroactively to these defendants. Whether, however, that judgment now bars prosecution of charges not joined therein is a question which must be answered in light of the purposes served by the doctrine of res judicata.

## B

The trial court, borrowing from 1 Restatement (Second), Judgments § 24, applied a broad transactional test and held that capital felony was the "same" offense as the charges previously dismissed. We first observe that Restatement views are based on thoughtful consideration of finality concepts which have evolved only incrementally through decided cases in the civil law. Acknowledging the source of its premises, the Restate-

---

[24] In *United States* v. *Oppenheimer,* 242 U.S. 85, 37 S. Ct. 68, 61 L. Ed. 161 (1916), the charges brought against the defendant were dismissed before trial as barred by the statute of limitations. Subsequently, in an unrelated action not involving Oppenheimer, the statute of limitations was held inapplicable to those charges, and the government reinitiated the dismissed prosecution. It argued that since the statute had been found not to apply, and since jeopardy had not attached, there was nothing to prevent prosecution of the dismissed charges. The United States Supreme Court held otherwise. The government had not appealed the dismissal, so as to Oppenheimer, the matter was res judicata. As to *those* charges, the dismissal was on the merits. The court did not hold, as the issue was not before it, that other charges that could have been joined in the first prosecution, and which would have survived the erroneous dismissal, were also foreclosed from future prosecution.

ment has expressly limited its scope accordingly.[25] See Vestal, "The Restatement (Second) of Judgments: A Modest Dissent," 66 Cornell L. Rev. 464, 506 (1981). The doctrine of finality "serves an important role in civil cases, where it originated and where society's primary concern is to provide a means of peaceful, swift and impartial resolution of private disputes . . . . It is less relevant in criminal cases where the pre-eminent concern is to reach a correct result and where other considerations peculiar to criminal prosecutions may outweigh the need to avoid repetitive litigation . . . ." *People* v. *Plevy,* 52 N.Y.2d 58, 64, 417 N.E.2d 518, 436 N.Y.S.2d 224 (1980). In civil litigation it is not unreasonable to require plaintiffs seeking to vindicate personal interests to join all related theories of recovery in a single lawsuit. But the state's attorney represents the broader public interest in the effective administration of criminal justice. *State* v. *Moynahan,* 164 Conn. 560, 568, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973). The incongruous equation between the terms "cause of action" and "criminal prosecution" reflects the very different purposes served by each. The state's attorney does not bring a "lawsuit" to recover in "damages" on a "bundle of rights." The decision to prosecute is the initial step in the effectuation of broad social policies represented by the criminal law itself. Where matters properly characterized as "issues" have once been fully litigated and decided, we have applied the doctrine of collateral estoppel in the criminal context to foreclose relitigation. *Aillon II,* supra; *State* v. *Wilson,* supra.

---

[25] "When the two proceedings in question are both criminal prosecutions, a judgment in the first prosecution may have preclusive effects as to issues determined and as to offenses adjudicated or deemed to have been adjudicated, such as lesser included offenses. It may also have preclusive effects through operation of the rule against placing an accused twice in jeopardy. These matters are beyond the scope of this Restatement." 2 Restatement (Second), Judgments § 85, comment a.

But the essentially public objectives of the criminal law advise against the uncritical adoption of civil joinder concepts.

In dismissing the capital felony charges, the trial court did not weigh the competing policies which underlie the judicial doctrine of res judicata. Rather, it employed a line of reasoning more appropriate to analysis under the double jeopardy clause. That line of analysis led the trial court to conclude that the crime of murder is the "same offense" as the crime of capital felony. And because the previous murder charges were dismissed on the merits, the trial court believed that the capital felony counts, because they were the "same" as the murder counts, had to be dismissed as well under the doctrine of res judicata.

We agree with the trial court's reasoning that the doctrine of res judicata precludes reprosecution of the same charges as those which have previously been dismissed on the merits. We also agree that a dismissal based on the statute of limitations is a dismissal on the merits. And while we express no opinion on the matter, we assume, arguendo, that the trial court correctly concluded that capital felony, for purposes of double jeopardy, is the "same offense" as murder. We do not agree, however, that the double jeopardy clause provided the appropriate basis of comparison from which to conclude that murder and capital felony are the "same offense" for purposes of res judicata.

We begin with the observation that it serves little purpose to characterize "offenses" as "different" or the "same" without the purpose of the comparison as a point of reference. That two offenses may be the "same" for purposes of double jeopardy does not mean that they are the same for purposes of the statute of limitations, or res judicata, or for any other purpose. It means only that they are the "same" for purposes

of double jeopardy, which in turn, is a concise way of saying that the legislature did not intend that cumulative punishments be imposed under separate statutory sections; *Missouri* v. *Hunter,* 459 U.S. 359, 368, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983); *Whalen* v. *United States,* 445 U.S. 684, 692, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980); and that successive prosecutions may not be maintained after jeopardy has once attached. *Brown* v. *Ohio,* 432 U.S. 161, 166, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977); *North Carolina* v. *Pearce,* 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969). This single point of similarity, while of inestimable importance in our scheme of individual liberties, does not make two offenses the same for all other purposes.

We recognize that as a practical matter, offenses are usually compared and characterized as being the "same" or "different" in the course of a double jeopardy analysis. But this is merely a circumstance of the proliferation of statutory offenses under modern penal codes. See *Ashe* v. *Swenson,* 397 U.S. 436, 445 n.10, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970), and Brennan, J., concurring therein. The same criminal act that formerly was identified, proscribed and punished under a single description may now violate several distinct statutory sections, and may lead to multiple prosecutions and cumulative punishments. In this context it becomes necessary to determine whether overlapping statutory crimes constitute the "same offense" for purposes of double jeopardy. See *Missouri* v. *Hunter,* supra. That these concerns are not present in this case militates against a strict double jeopardy analysis in determining whether capital felony and murder are the "same."

While our murder and capital felony statutes may proscribe similar criminal conduct in ways only slightly different from each other, these ways are nonetheless different. Elementary rules of statutory construction require the presumption that the legislature did not

intend to enact superfluous legislation. *State* v. *Grant,* 176 Conn. 17, 20, 404 A.2d 873 (1978); *McAdams* v. *Barbieri,* 143 Conn. 405, 419, 123 A.2d 182 (1956). Thus, we believe that murder and capital felony are different at least to the extent that different procedural and punitive consequences flow from their statutory descriptions. Murder and capital felony do not contain the same statutory elements, they are not the same for purposes of providing notice in the bill of particulars, they are not subject to the same rights to pretrial bail, they do not carry the same punishment, and under the law of this case, they are not subject to the same limitation period on prosecution. That they may be the "same" for purposes of double jeopardy does not decide the question of whether they are the same for purposes of res judicata. Unless dismissal is required by some purpose served by the doctrine of res judicata, the fact that murder and capital felony may be the same for a single unrelated purpose is simply not relevant.[26]

Thus, the fact that murder may be a lesser included offense of capital felony sheds no light on the proper inquiry. That inquiry looks to the actual litigation which has occurred in the former prosecution, to the claims raised, the issues decided, and the attendant expenditure of judicial resources. It further looks to the potential for inconsistent judgments which tend to undermine

---

[26] The trial court further reasoned that the offenses were the same because the "elements" of the crime of capital felony were the same as the elements in combination that the state would have "had" to prove in prosecuting the dismissed charges of murder, felony murder and kidnapping. This reasoning assumes that if the state had not charged, for example, kidnapping, in the prior prosecution, the former and later prosecutions would be more "different" because the combination of "elements" in each would not be the "same." The state did not "have" to prove kidnapping in the former prosecution. It charged that crime, because in the judgment of the state's attorney, it, along with murder and felony murder, best described the conduct for which the defendants were culpable. The trial court's reasoning makes the doctrine of res judicata depend on the initial charging decision rather than on the actual litigation occurring in the prior proceeding.

the integrity of the judicial system, and to the harrassing effects of repetitious litigation on the defendant. See Part III, supra. It is a fundamental concern of double jeopardy that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby. . . enhancing the possibility that even though innocent he may be found guilty." *Green* v. *United States,* 355 U.S. 184, 187–88, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957). Yet the United States Supreme Court has consistently declined to hold that double jeopardy requires the prosecution "to join at one *trial* all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction." (Emphasis added.) *Ashe* v. *Swenson,* supra, 453–54 (Brennan, J., concurring); see *Thompson* v. *Oklahoma,* 429 U.S. 1053, 97 S. Ct. 768, 50 L. Ed. 2d 770 (1977) (Brennan, J., dissenting from denial of certiorari), and cases collected therein.[27]

---

[27] Because the doctrine of claim preclusion has not been so extended in the criminal context, the majority of litigation in this area arises under the double jeopardy clause. In the typical situation, the defendant is retried, *after conviction or acquittal,* for a closely related offense arising out of the same incident as gave rise to the former prosecution. Whether the second prosecution is barred by double jeopardy is generally held to depend on whether the two offenses are the "same" under *Blockburger* v. *United States,* 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). In most jurisdictions these later prosecutions are allowed to proceed. See, e.g., *Flittie* v. *Solem,* 751 F.2d 967 (8th Cir. 1985) (acquittal as principal in murder prosecution followed by conviction as accessory); *United States* v. *McCoy,* 721 F.2d 473, 475 (4th Cir. 1983), cert. denied, 466 U.S. 940, 104 S. Ct. 1918, 80 L. Ed. 2d 465 (1984) (acquittal as aider and abettor in murder prosecution followed by conviction as accessory after the fact); *United States* v. *Powell,* 632 F.2d 754 (9th Cir. 1980) (acquittal of narcotics possession followed by conviction for conspiracy to possess); *United States* v. *DeVincent,* 632 F.2d 147, 154 (1st Cir.), cert. denied, 449 U.S. 986, 101 S. Ct. 405, 66 L. Ed. 2d 249 (1980) (acquittal of racketeering conspiracy followed by conviction for extortion); *Brown* v. *Alabama,* 619 F.2d 376 (5th Cir. 1980) (conviction for robbery followed by conviction for assault; same incident); *United States* v. *Guillette,* 547 F.2d 743, 755 (2d Cir. 1976), cert. denied, 434 U.S. 839, 98 S. Ct. 132, 54 L. Ed. 2d 102 (1977); *Commonwealth* v. *Benson,* 389 Mass. 473, 451 N.E.2d 118, cert. denied, 464 U.S. 915, 104 S. Ct. 278, 78 L. Ed. 2d 257 (1983) (acquittal of arson and breaking and

In some states mandatory joinder of offenses is required by statute or court rule. See *People* v. *Creek,* 94 Ill. 2d 526, 447 N.E.2d 330 (1983); *State* v. *Bretz,* 605 P.2d 974 (Mont.), cert. denied, 444 U.S. 994, 100 S. Ct. 529, 62 L. Ed. 2d 425 (1979), reh. denied, 444 U.S. 1104, 100 S. Ct. 1073, 62 L. Ed. 2d 791 (1980); *State* v. *Russell,* 101 Wash. 2d 349, 678 P.2d 332 (1984); see also Vestal & Gilbert, "Preclusion of Duplicative Prosecutions: A Developing Mosiac," 47 Mo. L. Rev. 1, 15–19 (1982). We do not believe, however, that such a rule should be enforced in the prejeopardy stage under the doctrine of res judicata unless the policies underlying that doctrine so indicate. Thus, the narrow question in this case is whether prosecution of these defendants for capital felony, after a pretrial dismissal of murder, felony murder and kidnapping charges based on the statute of limitations, would contravene some sound principle of finality embodied in the doctrine of res judicata.

Turning first to the question of judicial economy, it must be recalled that *Paradise I* was decided by pretrial motion. Such motions are not uncommon, even with respect to charges far less serious than these, and we perceive no substantially greater drain on judicial resources in the litigation of this motion than in that of many others. This motion involved no testimony of witnesses, no factual matters of any sort, and relatively little trial time. It involved purely a question of law;

---

entering with intent to commit arson followed by conviction for conspiracy to commit arson); *People* v. *Dean,* 45 N.Y.2d 651, 659, 384 N.E.2d 1277, 412 N.Y.S.2d 353 (1978) (acquittal of grand larceny followed by conviction for larceny).

We take these cases, and numerous others; see annot., "Modern Status of Doctrine of Res Judicata in Criminal Cases," 9 A.L.R.3d 203, 214 (1966); as strong indication that the type of joinder envisioned by the trial court's holding is not in widespread practice. For if it were, the doctrine of res judicata would preempt entirely the need to litigate the serial prosecution issue on double jeopardy grounds.

and that this question was difficult or complicated does not alone invoke the doctrine of res judicata. We do not understand the defendants to contend that joinder of the capital felony charges in the earlier proceeding would have had any effect whatsoever on the question whether the prosecutions for murder, felony murder and kidnapping were barred by the statute of limitations. That an appeal was taken in *Paradise I,* involving substantial consumption of appellate resources, is simply not relevant to the computation of resources expended by the trial court in deciding the motion to dismiss. It is at that point the defendants contend the capital felony charges should have been joined, and we do not consider the resources expended in the adjudication of that motion sufficient to justify the broad preclusive effect accorded it by the trial court.

Nor do we believe that prosecution of these capital felony charges involves the potential for any inconsistency with the judgment in *Paradise I.* Our statute of limitations distinguishes between offenses according to their severity, and there is nothing inconsistent in the fact that some prosecutions are barred where others are not. We further believe that confidence in our judicial system would be severely eroded if serious charges were dismissed by the courts for reasons of judicial policy, when the legislature, through the statute of limitations, has manifested an intent that they be prosecuted.

The case may arise where the doctrine of res judicata will require dismissal of charges not joined in an earlier prosecution. We recognize the grave potential for harrassment and abuse which may occur even in the prejeopardy stage, where the burden, expense and ordeal of pretrial proceedings is often no less than that of trial itself. See *Crist* v. *Bretz,* 437 U.S. 28, 49–50, 98 S. Ct. 2156, 57 L. Ed. 2d 24 (1978) (Powell, J., dissenting); Westen & Drubel, "Toward a General The-

ory of Double Jeopardy," Sup. Ct. Rev. 81, 87 (1978). The progression and nature of pretrial proceedings are certainly relevant to the application of res judicata in pretrial motion litigation. And depending on what has been actually litigated and actually decided, the state may be barred from bringing new charges after a pretrial motion has been granted. See *United States ex rel. Hubbard* v. *Hatrak,* 588 F.2d 414, 417–19 (3d Cir. 1978), cert. denied, 440 U.S. 974, 99 S. Ct. 1541, 59 L. Ed. 2d 792 (1979); *United States ex rel. DiGiangiemo* v. *Regan,* 528 F.2d 1262, 1265–66 (2d Cir. 1975), cert. denied, 426 U.S. 950, 96 S. Ct. 3172, 49 L. Ed. 2d 1187 (1976).

Every prosecution is necessarily "harrassing" and "vexatious" from the standpoint of the defendant, and the doctrine of res judicata must look to something beyond the inconvenience attending a finding of probable cause. Principles of finality are offended only by that harrassment which results from repetitious attempts to relitigate matters previously decided. Weighing against the minimal interests in finality presented by this case are strong social and legislative policies aimed at the effective administration of criminal justice. Cf. *In re Juvenile Appeal (83–DE),* supra, 318–19. "The interests of the public in seeing that a criminal prosecution proceed to verdict, either of acquittal or conviction, need not be forsaken by the formulation or application of rigid rules that necessarily preclude the vindication of that interest. This consideration, whether termed the 'ends of public justice' . . . or, more precisely, 'the public's interest in fair trials designed to end in just judgments' . . . has not been disregarded by this [c]ourt." (Citations omitted.) *Illinois* v. *Somerville,* 410 U.S. 458, 463, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1973).

The defendants do not contend, nor do we find, that the state reinitiated prosecution in this case for other

than constitutionally legitimate reasons. Where the double jeopardy clause is inapplicable, due process protects against vindictive or coercive use of the power to prosecute. See *United States* v. *Goodwin,* 457 U.S. 368, 372, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982); *Blackledge* v. *Perry,* 417 U.S. 21, 28–29, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974). Additional protection against prosecutorial harrassment is afforded by the inherent supervisory powers of the court over legal process in this state. See *State* v. *Pelletier,* 196 Conn. 32, 36, 490 A.2d 515 (1985) (*Shea, J.,* concurring); *State* v. *Ubaldi,* 190 Conn. 559, 570, 462 A.2d 1001, cert. denied, 462 U.S. 1001, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). But we have traditionally accorded the state's attorney "broad discretion in determining what crime or crimes to charge in any particular situation." *State* v. *Chetcuti,* 173 Conn. 165, 168, 377 A.2d 263 (1977). And unless constitutional or other compelling reasons require otherwise, we abstain from setting policy for the performance of the prosecutorial function. See *State* v. *Haskins,* 188 Conn. 432, 474, 450 A.2d 828 (1982).[28]

We find that the trial court improperly applied the doctrine of res judicata in this case, and the judgments of dismissal must be set aside.

There is error in the state's appeal, the judgments are set aside and the cases are remanded for further proceedings.

---

[28] The state's attorney must necessarily exercise discretion in deciding what offense to charge, including his opinion as to the defendant's guilt, the likelihood of conviction, the evaluation of legal issues, the availability of witnesses, and possible alternatives to prosecution. See LaFave, "The Prosecutor's Discretion in the United States," 18 Am. J. Comp. L. 532, 533–35 (1970). In the prosecution of capital crimes, personal or moral views are likely to enter the decision as well. It is evident on the facts of this case that, for whatever reason, the state's attorney did not believe that capital felony was the appropriate crime with which to initially charge these defendants. We decline to adopt a rule which would have required him to do so.

To the question in the reservation, we answer "No." No costs will be taxed to any party.

In this opinion HEALEY, SANTANIELLO and CALLAHAN, Js., concurred.

PETERS, C. J., dissenting in part. I agree with the majority opinion in its disposition of the question reserved for advice, namely that the prosecution of the defendant Worthington is not barred by the statute of limitations which was in effect in 1974, General Statutes § 54-193. I disagree, however, with the majority opinion's conclusion that our decision in *State* v. *Paradise,* 189 Conn. 346, 456 A.2d 305 (1983) *(Paradise I),* is no obstacle to the prosecution of the defendants Paradise and Ellis for capital felony.

Before I come to the grounds of my disagreement with the majority opinion, it is useful, I believe, to make clear the extent to which we all concur about the issues raised by the decision in *Paradise I.* Our concurrence covers the following significant points: (1) the new charges of capital felony against the defendants Paradise and Ellis arise out of the same incident and refer to the same victim as the charges involved in *Paradise I,* where these defendants were held to answer for murder, felony murder and kidnapping; (2) the doctrine of res judicata bars reprosecution of the same charges as those previously dismissed on the merits; (3) the judgment in *Paradise I* was a judgment of dismissal on the merits; and (4) for the purposes of double jeopardy, the charge of capital felony is the same offense as the charge of murder.

In light of these conclusions, I would hold, as did the trial court, that the state may not now reprosecute these defendants for capital felony, because in the circumstances of this case, capital felony and murder are as much the same charges for the purposes of res judicata as they are for the purposes of double jeop-

ardy. The majority opinion mistakes the nature of the question when it states the issue to be whether the state must join in a single prosecution *all discrete* statutory offenses arising from a single criminal transaction. Neither the trial court nor the defendants have advanced a theory of mandatory joinder of criminal charges. The dispositive issue is, I believe, a much narrower one. It is whether, after a criminal prosecution has been dismissed on the merits, a defendant may be reprosecuted on a new charge that is the *same* offense as that for which he was earlier unsuccessfully prosecuted.

In addressing that issue, I believe it is improper to imply that there are different classes of dismissals on the merits that warrant different views of what constitutes the same offense. The majority opinion concludes that "a pretrial dismissal, based on the statute of limitations, is not the logical or practical equivalent of a full and fair opportunity to litigate" and that therefore the sole effect of the decision in *Paradise I* is to foreclose relitigation of the retroactivity of the amended statute of limitations. In effect, this reasoning relegates the holding of *United States* v. *Oppenheimer,* 242 U.S. 85, 37 S. Ct. 68, 61 L. Ed. 161 (1916), to one of issue preclusion. I do not believe that *United States* v. *Oppenheimer* is so limited. Indeed, *Oppenheimer* expressly stated: "It cannot be that a judgment of acquittal on the ground of the statute of limitations is less a protection against a second trial than a judgment upon the ground of innocence, or that such a judgment is any more effective when entered after a verdict than if entered by the Government's consent before a jury is empaneled . . . ." Id., 87. Furthermore, this court has only recently held, in *State* v. *Aillon,* 189 Conn. 416, 424–26, 456 A.2d 279, cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983), that both the state and the criminal defendant are precluded by the principles of res judicata from

relitigating claims that have previously resulted in an adverse final judgment. The fact that the final judgment in *Aillon* occurred after a trial and two subsequent mistrials was in no way crucial to its determination that "[u]nder the doctrine of res judicata, or claim preclusion, a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim." Id., 423.

The issue that is before us is therefore a simple one: is there any significant difference between the crime of capital felony and the crimes of murder, felony murder and kidnapping? Neither the state nor the majority opinion has in any way refuted the trial court's observation that a new trial on the new charge would require the state to prove the same elements with the same evidence as would have been pertinent to a trial on the offenses charged in *Paradise I*. The state is making identical claims in both prosecutions, namely, that the defendants kidnapped Cunningham and intentionally killed him during the kidnapping.

Attempting to transcend this basic identity between the new and the old charges, the majority opinion focuses on the difference in penalty between capital felony and other forms of murder. Because capital felony exposes a defendant to the risk of the death penalty, due process and our statutes require that the defendant be specifically notified of that risk and of the particular aggravating factors that may subject him to that penalty. Enhancing the punishment for a crime does not, however, transform it into a distinct new offense. Our persistent felony offender statutes, such as General Statutes § 53a-70, impose increased sanctions on defendants who have committed two or more specified felonies. Like the capital felony statute, § 53a-70 has "procedural and punitive consequences" different from those accompanying the basic offense. Yet "[a] person accused of being a persistent danger-

ous felony offender is not charged with a crime separate from the substantive crime which forms the first part of the indictment against him. *State* v. *Sinclair,* 184 Conn. 215, 216, 439 A.2d 945 (1981); *State* v. *Perkins,* 169 Conn. 263, 264–65, 363 A.2d 141 (1975). The only function of the separate judicial proceeding on the defendant's status as a persistent dangerous felon is to permit an enhanced sentence for conviction of the underlying substantive crime. See General Statutes § 53a-40 (e); *State* v. *Lewis,* 176 Conn. 270, 272, 407 A.2d 955 (1978); *State* v. *Perkins,* supra, 264–65." *State* v. *Fullwood,* 194 Conn. 573, 587, 484 A.2d 435 (1984). Similarly, the capital felony statute does not define a new offense when it increases the punishment for certain previously established classes of murders. Because the state's claim in this case is functionally the same as the claim that was prosecuted in *Paradise I,* reprosecution is barred by the final judgment for the defendants in that case.

I do not disagree in principle with the observation that there is not a total congruence between the tenets of double jeopardy and those of res judicata, or between the applicable tests for res judicata in the criminal and the civil law. See *State* v. *Aillon,* supra, 424–25; Vestal & Gilbert, "Preclusion of Duplicative Prosecutions: A Developing Mosaic," 47 Mo. L. Rev. 1 (1982). Modern jurisprudence warns of the dangers of reliance on doctrinal transfer without regard to the constraints of context. I am, however, unpersuaded that in this case a proper application of preclusion principles warrants a reprosecution whose legitimacy turns solely upon the possible imposition of an enhanced penalty for conviction of capital felony. A criminal justice system that aspires to meet basic standards of fairness and due process cannot take judicial economy as its primary goal, and it is therefore irrelevant that the defendants' entirely proper vindication in *Paradise I* resulted from

a final judgment that was rendered in pretrial proceedings rather than from a verdict at the end of a full trial. In *State* v. *Aillon,* where it was the defendant rather than the state that sought to relitigate a claim, we stated that "[t]he interest in achieving finality in criminal proceedings must be balanced against the interest in assuring that no individual is deprived of his liberty in violation of his constitutional rights." *State* v. *Aillon,* supra, 425. Despite the constitutional rights at stake in *Aillon,* we concluded that res judicata applied and that the defendant's claim was barred. In this case, there is no conflict of principle between finality and a defendant's constitutional interest in liberty; both are on the same side of the scale. The state has no constitutional interest in a successful prosecution that outbalances a defendant's interest in the finality of a judgment on the merits on the same claim.

The majority's characterization of the defendants' interest in res judicata as a "minimum interest in finality," when the state seeks reprosecution on charges that are substantially identical to those on which a prior prosecution failed, ignores serious constitutional concerns of fundamental fairness. No articulable principle of criminal justice is vindicated by the majority's differentiation in this case between double jeopardy and res judicata. By the reasoning of the majority, although reprosecution of these defendants for capital felony would have been precluded the instant a jury had been empaneled in their first prosecution, their present reprosecution is permissible because the defendants raised a valid pretrial defense. In effect, the majority imposes upon the defendants the punishment of increased jeopardy for having exercised their right to contest the validity of the original proceedings against them. Such a result is unconstitutional. Due process forbids punishing criminal defendants for the exercise of constitutional or statutory rights. Had the defend-

ants mounted a successful appeal of their conviction after trial of the charges originally brought against them, they could not have been subjected to increased punishment upon reconviction. *North Carolina* v. *Pearce,* 395 U.S. 711, 723–26, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969). Reindictment on capital felony charges while such an appeal was pending would also have been constitutionally barred. *Blackledge* v. *Perry,* 417 U.S. 21, 27–29, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974). To expose these defendants at this time, on this record, to the death penalty, because they successfully defended themselves against essentially identical charges in *Paradise I,* raises serious constitutional questions of due process totally apart from proof of actual prosecutorial vindictiveness or harassment.

The administration of criminal justice commands public confidence and respect only when it strikes a proper balance between the governmental interest in the effective prosecution of crime and the personal rights of criminal defendants to due process and fairness. The prosecutorial interest of the government is circumscribed by numerous rights afforded to criminal defendants by our state and federal constitutions, including the protection against unlawful search and seizure and the privilege against self-incrimination. The principle of finality expressed both in the tenets of the law of double jeopardy and in the rule of res judicata embodies yet another important personal right. History has repeatedly taught us that the only enduring guarantee of a just legal system is to afford fundamental rights and due process even to those accused of having committed horrendous crimes such as murder.

Accordingly, I dissent from the setting aside of the judgments in favor of Paradise and Ellis.