[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 2095
The plaintiff owns a full service, conventional gasoline station at 580 North Avenue in Bridgeport. The property is located in a Light Industrial Zone. For some time the plaintiff has sought to obtain the zoning authority's permission to construct a new building on the site which would serve as a snack shop, to build a new canopy, and replace the present full service islands with islands containing self-service pumps. In its latest endeavor the plaintiff submitted a petition for a special exception pursuant to the Zoning regulations.
A hearing was held on the plaintiff's petition in October of 1991 and on October 23, 1991 the Zoning Board voted to deny the petition of Mobil Oil Corporation for a special exception.
The defendant board's denial was based on the following reasons:
 (1.) The establishment of the additional convenience snack shop use together with a gasoline station would generate additional on site traffic. The proposed on site traffic flow pattern, with the only exit being on French Street, would cause a backing up of traffic exiting the site resulting in an improper and hazardous exiting from the site directly onto North Avenue.
 (2.) The granting of this petition will adversely impact the already existing traffic congestion in the immediate area.
Chapter 21, Section 2(b) of the Bridgeport Zoning Regulations define special exceptions and the scope of the defendant board's review. Among other things the board must consider:
. . . .
 "(b) The capacity of adjacent and feeder streets to handle peak traffic loads and CT Page 2096 hazards created by the use.
. . . .
. . . .
 (e) The extent, nature and arrangement of parking facilities entrances and exits . . ."
Relying on Section 8-8 of the General Statutes the plaintiff has appealed the decision of the board to the superior court.
 I.
Aggrievement
Mobil Oil Corporation is the owner of the land which is the subject of this appeal. In denying the corporation's petition for a special exception the plaintiff was denied its desired use of the property. Therefore, the plaintiff is aggrieved and has standing to prosecute this appeal; Winchester Woods Associates v. Planning and Zoning Commission, 219 Conn. 303, 308 (1991); Bossert Corporation v. Norwalk, 157 Conn. 279, 285 (1968).
 II.
Standard of Review
The legal principles that should govern court review of the actions of a zoning authority have been set forth in several cases over many years.
On the one hand, it is clear that local zoning authorities are meant to have a great deal of discretion. In Goldfeld v. Planning Zoning Commission, 3 Conn. App. 172 (1985), the court said the question is not whether the trial court would have reached the same result as the local zoning authority. A trial court cannot weigh the evidence or the credibility of witnesses or substitute its own judgment for that of the zoning authority. First Hartford Realty Corporation v. Planning Zoning Commission, 165 Conn. 533, 543 (1973). As the cases emphasize, the local zoning authority is familiar with local conditions. Suffield Heights Corporation v. Town Planning Commission, 144 Conn. 425
(1957); Burnham v. Planning Zoning Commission, 189 Conn. 261, CT Page 2097 265 (1983).
On the other hand, the statutes do give a right of appeal to parties who are aggrieved by the action of the local zoning authority and that appellate review is not limited to determining whether or not the zoning authority followed correct procedure as to notice or the right to a hearing or whether hearing officers were improperly influenced.
 "Conclusions reached by the commission must be upheld by the trial court if they are reasonably supported by the record Goldfeld v. Planning Zoning Commission, 3 Conn. App. at page 178. (emphasis added)
 "Courts must not disturb the decision of a zoning commission unless the party aggrieved by that decision establishes that the commission acted arbitrarily or illegally." Burnham v. Planning and Zoning Commission, 189 Conn. at page 265.
As stated in the case of Suffield Heights Corporation v. Town Planning Commission, 144 Conn. 425 (1957):
 "The legislature has given a right of appeal from the decisions of local zoning authorities to the Court of Common Pleas, which may `reverse or affirm, wholly or partly, or may modify or revise the decision appealed from'. . . . In light of the statute, a court cannot take the view in every case that the discretion exercised by the local zoning authority must not be disturbed, or if it did the right of appeal would be empty. Therefore, the court can grant relief upon appeal in those cases where the local authority has acted arbitrarily or illegally and consequently has abused the discretion entrusted to it." Id. at page 428.
Guided by these general principles, the court will not CT Page 2098 examine the issues raised in this appeal.
 III.
Both sides have requested the court to take judicial notice of an earlier file, Mobil Oil Corporation v. Zoning Board of Appeals, Fairfield J.D., No. 274219. In that case the plaintiff applied for a special exception to construct a snack bar and self-service pumps and a side line variance in order to build a canopy over the pumps. The application concerned the same parcel of land which is the subject of the appeal before this court. The court will take judicial notice of the earlier file since it is necessary to do so in order to resolve issues raised in this appeal.
The plaintiff correctly notes that per Judge Dean the court in the earlier case (No. 274219) sustained the plaintiff's appeal from the denial of its application for a special exception for a snack bar and the construction of two self-service pump islands running parallel to each other and also parallel to North Avenue which fronts the subject parcel. But the plaintiff also needed and applied for a side line variance in order to construct a required fire suppressant canopy over the pumps and the court held that the denial of the variance was supported by the record and dismissed the appeal with respect to the variance.
In order to advert the need to secure a variance the plaintiff redesigned its application for a special exception. It proposed the same snack bar but now proposed to construct four self-service island pumps running parallel to each other but diagonal to North Avenue. The newly submitted application was denied by the board and that denial is the subject of this appeal.
Both sides refer to the earlier file and appeal to raise issues which they claim should cause them to prevail in the appeal now before the court.
On the one hand the plaintiff argues that the principles of collateral estoppel require the court to sustain this appeal or at least certain aspects of it on the grounds that the issues presented have been favorably litigated for the defendant per the decision of Judge Dean. CT Page 2099
The defendant for its part maintained before the board when this application was presented and in oral argument before the court that at the hearing on the prior application the plaintiff conceded that its then proposed two self-service islands parallel to each other and to North Avenue were the only safe and appropriate way to have self-service islands on this parcel. The defendant argues that this should be considered an admission by the plaintiff that its present proposal for the diagonal lay out of the islands would in fact present traffic problems on both French Street and North Avenue.
(A)
The plaintiff refers to the case of Carothers v. Copozziello, 215 Conn. 82 (1990) for its argument as to collateral estoppel. At pages 94 and 95 the court says the following:
 "As a general proposition, the governing principle is that administrative adjudications have a preclusive effect when `the parties have had an adequate opportunity to litigate.' United States v. Utah Construction 
Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1965)." Convalescent Center of Bloomfield, Inc. v. Department of Income Maintenance, 208 Conn. 187, 195, 544 A.2d 604 (1988); Corey v. Avco-Lycoming Division, 163 Conn. 309, 318, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 903, 34 L.Ed.2d 699 (1973). "[A] valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court." 2 Restatement (Second), Judgments 83(1). "Our rules of res judicata are based on the public policy that `a party should not be allowed to relitigate a matter which it already has had an opportunity to litigate.' In re Juvenile Appeal (83-DE), 190 Conn. 310, CT Page 2100 318, 460 A.2d 1277 (1983). . . ." Duhaime v. American Reserve Life Ins. Co., 200 Conn. 360, 363-64, 511 A.2d 333 (1986). "Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim." In re Juvenile Appeal (83-DE), supra, 316; see Orselet v. DeMatteo, 206 Conn. 542, 544-46, 539 A.2d 95 (1988); Duhaime v. American Reserve Life Ins. Co., supra, 364-65."
The language of the court and the numerous Connecticut cases it cites make clear that the doctrines of collateral estoppel and res judicata are alive and well in our state. See also State v. Ellis, 197 Conn. 436, 466 (1985); P. X. Restaurant, Inc. v. Town of Windsor, et al, 189 Conn. 153
(1983). If in fact the defendant had a full and fair opportunity to litigate the plaintiff's entitlement to a snack shop and/or the placement of four self-service islands and if in fact these matters were litigated before the court acting through Judge Dean and adversely decided to the board, then it can be argued that the board should be estopped from relitigating these matters in this appeal.
Frankly, the citing of Carothors v. Copozziello, by the plaintiff is rather interesting. The plaintiff seeks to give collateral estoppel effect to a judgment of the superior court acting through Judge Dean who was reviewing the actions of the defendant administrative agency and thus acting as an appellate court. But Carothers was not concerned with the collateral estoppel effects of an appeal from an administrative agency but rather held that "the valid and final" determination of an "administrative tribunal" has res judicata effect. If for some reason the court decision of Judge Dean were held not to have res judicata effect, Carothers raises the prospect of whether — if collateral estoppel applies in this matter at all — the board should have been collaterally estopped from ruling in this case in any way differently from the way it ruled on the earlier application.
But turning directly to the plaintiff's collateral estoppel CT Page 2101 argument, the court finds it somewhat ambivalent or at least is having trouble understanding its intended scope. Referring to its first application and the prior litigation, the plaintiff in its brief argues that "this now protracted controversy involves two distinct improvements, a snack bar and a change from full service to self-service pumps" (page 7 of brief). On the following page it goes on to argue that applying collateral estoppel principles "to the facts of this case, it cannot be denied that the board had an adequate opportunity to litigate the issue of the plaintiff's entitlement to a snack shop both before the board and itself in 1990 and before the superior court (Dean, J.) in 1991." (emphasis added).
The argument to this point seems to be directed solely to the right of the defendant board to now contest that portion of the present application for a special exception which relates to a snack bar on the subject parcel. But the existence and operation of a snack bar and its effect if any on street congestion and hazardous traffic conditions is directly related to the number, configuration and location of the self-service islands on the parcel.
The flow of traffic into, on, and out of the site is necessarily related to the latter considerations whether people just want to go into the snack bar, just get gas or avail themselves of both services. The plaintiff seems to implicitly recognize this in its closing remarks on this topic in its brief. There the plaintiff in advancing its collateral estoppel claim makes much of the defendant board's alleged failure either to raise traffic issues in the first litigation or its raising of such issues and the adverse decision of Judge Dean.
Later in its brief (page 13 et seq.) the plaintiff explicitly broadens the collateral estoppel argument claiming the issue of traffic congestion has already been litigated and the board cannot relitigate the issue.
The rules defining the doctrines of res judicata and collateral estoppel are easier to set forth than to apply in particular cases. The justifications for the concepts have been "identified as being `(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation.'" State v. Ellis, 197 Conn. 436, CT Page 2102 466 (1985); cf. In re Juvenile Appeal, 190 Conn. 310, 318
(1983). On the other hand both these cases indicate these doctrines should not be mechanically applied and as the Ellis court notes the internal needs of the judicial system should not outweigh its function in permitting litigants to air their cases fully.
In this case the court should consider whether the adoption of the plaintiff's collateral estoppel doctrine would comport with the policies behind that doctrine and whether it would be fair under all the circumstances.
Carothers and all the cases that discuss collateral estoppel indicate that the doctrine should be applied against a party only when that party has had a full and fair opportunity to contest the issue in question. It is also true that in our state it has been held that . . . "without the availability of judicial review, neither the decision of an administrative agency nor that of a court is ordinarily entitled to be accorded preclusive effect in further litigation." Convalescent Center of Bloomfield, Inc. v. Department of Income Maintenance,208 Conn. 187, 200 (1988).
The plaintiff notes that in the first litigation the snack shop issue was fully contested before the board and the court and the board chose not to appeal Judge Dean's decision that the defendant erred in denying the plaintiff a special exception. Therefore, according to the plaintiff, the defendant should be collaterally estopped in its effort "to manufacture another record" in the present appeal in support of its denial of a special exception. See generally, Carpenter v. Planning and Zoning Commission, 176 Conn. 581, 591; Ginsburg v. Post,177 Conn. 610, 615; Haynes v. Power Facility, 177 Conn. 623, 630
Kofkoff Egg Farms Ltd. v. Johnson, 181 Conn. 143, 144.
But notions of common sense and fairness are not to be ignored in deciding whether the doctrine of collateral estoppel is being mechanically applied. The plaintiff itself did not appeal Judge Dean's dismissal of the appeal on the basis that there was no evidence of legal hardship and therefore no error in the board's denial of a side line variance. The defendant knew that this denial in effect forestalled the plaintiff's attempt to construct the self-service pumps. As counsel for the plaintiff conceded on the record (see page 10) without the variance . . . "what good would a Special Exception Permit do us." CT Page 2103 Under these circumstances to hold that the defendant didn't exercise a theoretical right of appeal concerning Judge Dean's sustaining the appeal on the special exception runs counter to the purposes of the doctrine the plaintiff seeks to rely on. Any appeal would have been pointless and indeed vexatious. The record even reflects that relatively soon after Judge Dean's ruling the plaintiff was preparing and discussing its new proposed four island plan with zoning officials.
But the plaintiff's collateral estoppel argument should fail on more than basic policy and fairness grounds. Simply put, the doctrine just doesn't apply on the facts. An even cursory reading of the cases makes clear that for the doctrine to apply at all the very same issue must be in dispute in the procedurally separate litigations. Thus . . . "a party should not be allowed to relitigate a matter which it already has had a chance to litigate. . . ." Duhaime v. American Reserve Life Ins. Co., 200 Conn. 360, 363-364 (1986). The application that is the subject of this appeal requests a special exception to permit the construction of four self-service islands not two as in the first application; these islands run diagonally to North Avenue not parallel to it as the islands proposed in the first application. The movement of traffic on the site, access to parking, and the egress of traffic from the site would necessarily be different as between the two plans. Indeed, counsel for the plaintiff at page 11 of the record said . . . "we know this is a totally new application. I have to make a totally new record." In fact to paraphrase the plaintiff's argument, the plaintiff now seeks to manufacture a record on appeal in order to make a collateral estoppel argument — a record it failed to make before the board.
Isn't the plaintiff really asking the court to assume that the effect on traffic congestion and hazards are no different as between the plans submitted in the two applications? That's the necessary premise of its collateral estoppel claim. How can the court do that on the bare record here. If the plaintiff seeks to raise a collateral estoppel argument it should have the prima facie responsibility of showing that the present matter in litigation was the same as the matter previously litigated. Where in the record on this appeal did the plaintiff try to show that the two plans evidenced by the first special exception application and this new application though exhibiting different numbers and direction of the self-service islands really presented the same problems or non-problems as to traffic CT Page 2104 congestion or hazards? There is nothing of this nature in the record and the court must engage in speculation to invent the underpinnings of a collateral estoppel argument.
Finally, if collateral estoppel does properly apply here why did the plaintiff not apply for mandamus or injunctive relief against zoning officials who indicated a new application had to be filed. Cf. P. X. Restaurant, Inc. v. Town of Windsor, et al, supra. Are these remedies still available? Can the plaintiff ignore that relief and proceed on a whole new application and appeal from its denial and then raise collateral estoppel issues? The collateral estoppel claim should be held to have been waived in any event.
(B)
At the hearing before the defendant board on the plaintiff's first application for a special exception counsel for the plaintiff referred to the fact that it needed a side line variance so it could construct a fire suppressant canopy over the two self-service islands proposed in that application. As noted the self-service islands in that application were parallel to each other and parallel to North Avenue. Referring to that configuration counsel said
 "In order to locate our islands in such a way as that there will be a flow through the site so that there will not be a traffic problem on either of the streets, the major street being North Avenue, we have located our islands a certain way." See pp. 4-5 of Transcript, Record in CV90-0274219S.
On page 23 of the record in this case counsel for neighboring property owners referred to this language and argued . . . "that language indicates the old plans are really the only feasible way to do that" — i.e. insure flow of traffic through the site so that there wouldn't be traffic problems on North Avenue or French Street. The issue was properly raised on the record in this matter so the defendant board and intervenor may now argue that the remarks made by plaintiff's counsel can be used as an admission against the plaintiff — an admission that islands parallel to North Avenue were the only acceptable way to locate these islands and thus that four islands diagonal to CT Page 2105 North Avenue would by the plaintiff's own admission create traffic problems on the adjoining streets.
The fact that the statement was not against the plaintiff's interest when made is of no importance and it is certainly true that a lawyer can be held to have made an admission concerning his client's case. Collens v. New Canaan Water Co., 155 Conn. 477,496 (1967).
Such an admission is not conclusive on the plaintiff; it is not a judicial admission, see Perry v. Simpson Manufacturing Co., 40 Conn. 313, 317 (1873). The board could have considered the admission for what it was worth, Remkiewicz v. Remkiewicz,180 Conn. 114, 118 (1980); in fact the later case holds that a trier of fact can completely disregard such an admission. An admission must be examined in the context in which it was made and may amount to strong proof, Stitham v. LeWare, 134 Conn. 681,684 (1948); Toffolon v. Town of Avon, 173 Conn. 525, 536, see Handbook of Connecticut Evidence Taite v. LaPlante, 11.5, pp. 330 et seq.
The defendant board having denied the special exception in this matter, the court in reviewing its action must certainly take this admission into account as it must take into account any other piece of evidence supporting the board's position. However, militating against the court's giving the admission great weight is the fact that the board itself did not specifically allude to it on the record or mention it in its decision. Also, the statement can be viewed as mere "puffing" by counsel trying to put the best light on his client's position. More importantly perhaps, the admission when originally made and even when alluded to in the current record, was not made in the context of a discussion enlightened by expert or factual testimony which was focusing specifically on the traffic advantages of self-service islands running parallel to North Avenue as opposed to islands running diagonally to that street. Thus any adverse inferences sought to be drawn from the admission against the plaintiff's current application for diagonal self-service islands must in large measure be speculative.
 IV.
The board gave two reasons for the denial of the plaintiff's application for a special exception which have been CT Page 2106 previously set forth in this decision. For the purposes of analyzing the issues before the court it would seem to make more sense if the second reason is discussed first. In large measure the first reason for the denial has to be premised on a finding that there is support in the record for the second basis on which the defendant board denied this application.
(A)
The second reason given by the board for denying the application was that:
 "The granting of this petition will adversely impact already existing traffic congestion in the immediate area."
Is there reasonable support in the record for this conclusion?
As previously mentioned the subject parcel is on North Avenue and traffic exiting the site would move onto that street. The plaintiff's traffic expert, Mr. Cimino, prepared a detailed traffic study which was made a part of the record. In that study he gave the results of a traffic count for the A.M., noon, and P.M. peak traffic on North Avenue at Lindley Street immediately east of the site and at Housatonic and North Avenue which is in front of the easterly part of the site. The count also included readings for Lindley and Housatonic at these particular locations. North Avenue runs east to west; Lindley Street runs north to south. It intersects North Avenue and traffic from Lindley is allowed to enter north going east or west on that roadway. Housatonic #1 is a one way street going south from North Avenue and lies immediately to the west of Lindley; Housatonic #2 is to the immediate west of Housatonic #1. Housatonic #2 runs diagonally into North Avenue, accommodates traffic in both directions, but traffic heading north on Housatonic #2 can only turn right (east) into North Avenue.
Mr. Cimino in his report and before the board stated that traffic on North Avenue at these locations was at the A or B level of service which he described as "just about the best you can get." The "side streets" by which he meant Lindley and Housatonic had C and D service levels. The traffic study defines these levels of service (see page 18); these definitions CT Page 2107 were taken from the Highway Capacity Manual, Transportation Research Board, National Research Council, Washington, D.C., 1985. Mr. Cimino described level C service as a good level of service because by utilizing the traffic control signal it allows vehicles on the side streets "to expeditiously get out." According to him level C is what one looks for when one seeks design criteria for a traffic signal design. Service level D describes a situation where occasionally side street traffic won't be able to get out; on Housatonic Avenue this happened 25% of the time according to Cimino for traffic trying to enter North Avenue. Cimino felt the D level of service "wasn't that bad" and could be uniformly improved on these roadways to a C level if the timing of the traffic controls were changed. This would apparently not be too difficult an adjustment since North Avenue has such good service levels, A and B.
Both Mr. Cimino and counsel for the plaintiff, Mr. Cahill, stated at the hearing that their client certainly had the hope and expectation that if its application were approved more customers would use the service station, but could give no estimate as to the amount of increased business. Mr. Cimino was of the opinion that convenience store/self-service station operations like the proposed plan were not traffic generators but just drew pre-existing traffic from the traffic flow. He says that is a commonly held view by traffic engineers and this inference is expressed by the Institute of Transportation Engineers in their Traffic Generation Manual. Cimino testified that Mobil preferred to place self-service stations on major arteries to draw traffic from them and wanted this new station in order to be more competitive with other stations in the area. Cimino said there were a lot of gas stations in the area and Mr. Kaleeda, the traffic expert for the intervening parties opposing the application, indicated there was a gas station across the street from the subject parcel. The number and location of other stations apart from Kaleeda's observation were not noted in the record. Mr. Cimino believed some people would enter the contemplated site just to use the convenience store but the store was described as not having a broad variety of items but just "quick impulse pickup items." Besides a Mr. McCarthy who owns property near the site testified at the hearing that the business at his site and other stores in the area "house similar type businesses" — similar to that which will be offered in the convenience store.
The proposed plan as noted provides for four islands with a CT Page 2108 pump on each island capable of servicing two cars or a total of eight cars at full capacity. The pumps are self-service and the attorney for the plaintiff noted they are capable of accepting credit cards; he also noted that the hoses pump three to four times faster than conventional pumps. All of this led plaintiff's counsel to argue to the board that increased volume could be handled more expeditiously than the present full service pumps could accommodate. The common sense observation was also made that with self-service pumps customers don't have to wait for an attendant to service them. All of this can support the view that with the proposed plan traffic entering the site won't be stacked up into North Avenue. The existence of other stations in the area and even one across the street make this a remote possibility in any event since customers would just go on to another station. In any event there was no claim made in the record that if the new plan were approved cars entering the site would be backed up into North Avenue.
In opposition to the testimony of Mr. Cimino, Mr. George Kaleeda testified as a traffic expert in opposition to the application. He submitted a report and also testified. As regards the question of traffic congestion Mr. Kaleeda noted in his written report "the proposed gas station is in the middle of a complicated five way intersection" — in fact maps made exhibits and part of the record indicate the station lies slightly to the west of the referred to intersection. He further noted in his report that Lindley Street "dumps" a lot of traffic into this intersection. The heavy traffic exiting Route 25 extends the Lindley Street "phase" (apparently referring to traffic control), thus backing up traffic on North Avenue "especially in front of French Street making it difficult for these cars to go east (turn left) on North Avenue." As to traffic exiting French Street and desiring to go west on North Avenue, Mr. Kaleeda at the hearing before the board rather succinctly said — "Right turn no problem."
Much of the thrust of Kaleeda's testimony was directed at trying to show the traffic congestion that would result on French Street if the application were approved. The parties engaged in much dispute over the question as to whether under the proposed plan traffic exiting the site would only use French Street. Looking at the plans from a common sense point of view it would appear that with the diagonal lay out of the pump islands the traffic flow would be directed toward French Street. It would be possible for cars to go around the pumps and out CT Page 2109 onto North Avenue directly but depending on how busy the site is this would not be the expected egress. Mr. Kaleeda sought to buttress his conclusion that French Street would be congested under the proposed plan by two immediate premises. One, already mentioned, is his opinion that cars seeking to make a left turn from French onto North Avenue (easterly direction) would have a difficult time of it. Secondly, he forecast an enormous increase of customers at the site if the plan were approved. Without stating his methodology or reasoning in the report he submitted or in his testimony he extrapolated from the volume of business at a Mobil Station at North and Park what he thought the expected business at subject parcel would be. Twelve or thirteen hundred trips would be generated, there would be five times the existing usage and since the station would be open twenty-four hours, "the total would soar."
Much of the conjecture on the prospective congestion on French Street has to depend on the congestion or lack thereof on North Avenue onto which French Street feeds. The observations on traffic levels on North Avenue by Cimino have already been noted. Kaleeda testified that he checked with the Department of Transportation and traffic on North Avenue had increased 27% in these four years and was expected to increase on a yearly basis. This is all interesting but somewhat irrelevant if we don't know what portion of North Avenue these figures apply to and if we have no figures on road capacity. In fact, a similar lack of methodology is to be noted in the traffic table Mr. Kaleeda attached to his report — is observations on traffic levels at peak hours are not related to any traffic service levels or discussion of what these figures show concerning traffic congestion on North Avenue.
The same can be said about his previously noted comment in the traffic report on the back up on North Avenue caused by the Lindley "phase." When did this occur, how often, how long did the back up last so as to block egress from French onto North Avenue for cars wishing to travel east?
As will be discussed shortly a central issue to the court as regards traffic congestion and how it relates to the granting of a special exception is the question of traffic generation. That is, will the granting of this special exception create a facility that will draw traffic to the area, that is, increase the flow of traffic on North Avenue. Mr. Kaleeda testified that in his opinion a self-service station with a convenience store CT Page 2110 would be a traffic generator. In largely ad hominem remarks Mr. Kaleeda said people will try to find the best price for gasoline and will travel some distance for this purpose. Absent any evidence Mobil intends to offer its gas for free at this location and how its prices will compare with those at other stations if the application were to be approved, Mr. Kaleeda's testimony is of no relevance on the issue of traffic generation. He felt traffic would be generated by people using the convenience store but on this point he didn't indicate whether he believed availability of the store would draw more traffic to North Avenue or whether pre-existing traffic would just use the store if it was available. A succinct end to the issue of traffic generation can be made by referring to a comment by Attorney Luckart who represented neighbors opposing the application at the hearing before the board. In what could be characterized as an admission (see previous discussion on this topic) he made what from all the evidence seems to be a common sense observation. At page 24 of the record he referred to the testimony of Mr. Cimino:
 "When their traffic expert was speaking he was talking about how the new site is not going to generate new traffic, well, of course people aren't going to come from the east end of Bridgeport to get gas and snack foods at this shop, so it's not going to be (sic) new traffic to the area per se."
He goes on to say the real question is that more traffic will come into the site, exiting French Street and spilling into North Avenue creating traffic congestion. But this is a different concern from the issue of traffic generation.
Finally, it should be noted that several neighbors who owned or operated businesses near the subject parcel also testified at the hearing. At least one of these businesses would compete with the services offered by the convenience store. These individuals told the board that traffic is already congested in the area; the fire department and police department use Housatonic on a regular basis and there is heavy traffic in the Lindley-Housatonic-North Avenue intersection.
What must be made clear as the court is about to discuss the legal questions before it is the fact that the only issue CT Page 2111 before the court as far as the second reason for the denial is concerned is the issue of traffic congestion. The opponents to the application seem to recognize this at one point in their brief when beginning their argument on this topic they say that granting this application would "exacerbate an already bad traffic congestion problem in the area." When a zoning board has stated its reason for a particular decision, the court cannot go behind that reason and must confine its analysis to the reason given. DeMaria v. Planning Zoning Commission, 159 Conn. 534,541 (1970); Housatonic Terminal Corporation v. Planning Zoning Commission, 168 Conn. 304, 305 (1975); cf. Spectrum of Conn. v. Planning Zoning Commission, 13 Conn. App. 159, 163-164 (1988).
First let it be said that the court does not accept the plaintiff's argument that Mr. Kaleeda cannot be regarded as an expert witness. The traffic study Mr. Kaleeda submitted includes a brief summary of his background and this is all part of the record. Mr. Kaleeda has had a great deal of practical experience and educational background in the area of traffic engineering, Bryan v. Town of Branford, 50 Conn. 246, 248
(1882); Davis v. Margolis, 215 Conn. 408, 416 (1990). Cases cited by the plaintiff such as Osborne v. Troup, 60 Conn. 485,495 (1819); and Dore v. Babcock, 72 Conn. 408, 419 (1899) are not on point in that they involve situations where the person sought to be used as an expert in a technical area obviously had no qualifications to testify as an expert and the trial courts were upheld in so ruling. It is interesting to note that at no time before the board did the plaintiff raise the question of Mr. Kaleeda's status as an expert witness and only does so now on appeal.
Even if the plaintiff's position were to be accepted and Mr. Cimino were to be regarded as the only expert who testified that does not lead the court to conclude in lock step fashion that his opinions were binding on the board and thus the board erred in denying this application. The board was free to accept or reject any expert testimony offered in this matter. Pischitto v. Waldron, 147 Conn. 171, 172 (1960). Issues of traffic congestion are not highly technical in nature, cf. State v. Hammond, 221 Conn. 264, 269 (1992) so that the board could have accepted lay testimony over that of an expert, cf. State v. Davis, 158 Conn. 341 (1969), and could have relied on their own lay opinion over that of an expert, Van Detti v. Parsons Brothers, Inc., 146 Conn. 282, 286 (1959), see generally Feinson v. Conservation Commission, 180 Conn. 421, 427 (1980). CT Page 2112
Turning to the merits of this issue it would be well to review the nature of a request for a special exception. As Rathkopf, Law of Zoning Planning Volume 3 Section 41.05 succinctly notes
 "The essential difference between a special exception use and a variance is that a variance is an authority to a property owner to use his property in a manner forbidden by the ordinance, while a special exception allows him to put his property to a use which the ordinance expressly permits." See also A. P. W. Holding Corp. v. Planning Zoning Corporation, 167 Conn. 182, 184 (1974), Fox v. Zoning Board of Appeals, 146 Conn. 70, 72 (1958).
If a landowner meets the conditions established for the granting of a special exception, "the board is bound to grant one." Lurie v. Planning Zoning Commission, 160 Conn. 295, 305
(1971).
The second stated reason given by the board for the denial of this special exception — adverse impact on already existing congestion — refers directly to the leading case of Pecora v. Zoning Commission, 160 Conn. 295, 305 (1971); what is determinative "is not the overall volume of daily traffic but `congestion in the streets,' that is density of traffic." Id. at page 440.
There is certainly evidence in this record that there is a great deal of traffic entering and exiting the intersection of Lindley, Housatonic, and North Avenue. One neighbor, Mr. Meyer, testified about the fact that Housatonic is a main thoroughfare for the fire department and a unit of the police force. He mentioned that new businesses had led to increased truck traffic on Housatonic Avenue. Some trucks trying to negotiate turns from North Avenue into Housatonic do so in a dangerous manner. Other neighbors refer to the heavy volume of traffic; Mr. McCarthy describing the situation said this was a "high traffic location." It is also true that the board could have chosen not to believe Mr. Cimino's testimony about what he described as the excellent traffic levels on North Avenue in the vicinity of the CT Page 2113 subject parcel. Frankly, in the court's opinion as previously indicated Mr. Kaleeda's testimony and traffic study cannot form the basis for any reliable conclusion on the issue of traffic congestion. All this having been said a close examination of the record reveals that much of the neighbor's commentary concerns traffic conditions on Housatonic and at the aforementioned intersection and not on North Avenue as it abuts the subject parcel — it is hard to ascertain if the comments about traffic volume and heavy use of the roads by trucks and especially emergency vehicles concerns traffic moving north to south to and from the central city rather than east to west along North Avenue and thus in front of the subject parcel.
To paraphrase a Maryland case which cites Pecora at length what the opponents of the plaintiff's proposal appear to have done is confuse "volume with congestion. They are neither synonymous or necessarily closely related. Congestion is often the result of a disorderly flow of a small volume." Vestry of St. Marks on the Hill Episcopal Church v. Doub Baltimore County, et al, 149 A.2d 779, 783 (Md., 1959).
Most, if not all, of the complaints and observations of the public at the board hearing constituted a general and understandable complaint about the heavy traffic in the general area, not the more relevant and necessary consideration as to whether there in fact was congestion in the streets and even more importantly whether the plaintiff's proposal would itself have a deletorious effect on traffic conditions so as to lead to congestion in the streets. As previously discussed there is no credible evidence in the record to indicate that approval of this plan would generate traffic — that is, bring in more traffic to these streets. The record supports only the notion that it would draw from pre-existing traffic. As noted, Mr. Luckart, counsel for the intervening parties conceded as much. Thus, this is not the situation faced by the court in Primerica v. Planning and Zoning Commission, 211 Conn. 85 (1989). In that case the subject property was located on "a two lane road." That road was the "primary access" to certain residential areas. Residents and residential associations complained of the heavy traffic on the street not only during peak hours but throughout the day. The court reasoned that the defendant zoning authority, given this evidence could rely on their own knowledge of the area to confirm facts to which the residents testified. The court held the defendant did not err when it refused a zone change and thus barred a change in use of a facility which would CT Page 2114 have brought an additional unknown number of vehicles to the road and exacerbated an already dangerous situation, id. at pages 97-98.
In this case there is nothing in the record to support a finding that as far as North Avenue is concerned there is traffic congestion as defined by Pecora or that the plaintiff's proposal would lead to or exacerbate such congestion. The board can't simply find congestion by way of fiat. Nowhere does the defendant board discuss its observations and conclusions as to the possible effect on traffic conditions that would be brought about by the plaintiff's proposal. Certainly a zoning board can rely on its personal knowledge but when it does so it should explicitly so state and the facts personally known as they bear on the issue at hand "must be set forth in the record so that a reviewing court can scrutinize the basis of the decision." Rathkopf, Law of Zoning Planning Volume 3 page 37-79. Also see Mrowka v. Board of Zoning Appeals, 134 Conn. 149, 154
(1947); Dubiel v. Zoning Board of Appeals, 147 Conn. 517, 522
(1960). Any other conclusion would effectively abrogate the right of appeal.
Turning to the narrower question of French Street, let it be assumed from Kaleeda's testimony, the increased traffic on the site, the direction of the flow of traffic by the layout of the islands toward the French Street exit, the short distance between that exit and North Street, the busy nature of the major intersection which will make a left or west turn onto North Avenue more difficult that there will be added congestion on French Street. These are admittedly all assumptions and would have to rest on speculation. But making all these assumptions, would any ensuing congestion on French Street provide a basis for the board's denial of this application. First, let us discuss what French Street is. It is a short, dead end street described in the record at various times as between 30, 40 and 100 feet long — looking at the maps introduced into the record the latter figure seems more accurate. The record doesn't indicate that any businesses are located facing on French Street, although the operator of a business on North just west of French said some of his customers parked there. A map introduced into the record suggests there is a driveway leading into French Street. The record is silent, however, as to who uses this driveway, whether anyone does and for what purpose it might be used. When Pecora v. Zoning Commission, supra or Jarvis Acres, Inc. v. Zoning Commission, 163 Conn. 41, 49 (1972) CT Page 2115 talk about "density of traffic" and "congestion in the streets" they are not talking about concerns raised by congestion on a street like French Street. Vehicles subject to congestion on this street are not ordinary travellers using the public roads for their personal or business interests and subjected unwittingly to the delay and hardship caused by traffic congestion. They are rather the customers of the very use — the gas station — whose services they have chosen to take advantage of. Traffic congestion on a short, dead end street under such circumstances are not what Pecora and Jarvis had in mind. In fact whether or not the plaintiff's proposal were to be allowed, French Street seems to function as little more than a service street for the gasoline station on the subject parcel — it is a means of egress to North Avenue. Under these circumstances rejection of the plaintiff's proposal on the grounds of traffic congestion on French Street would be tantamount to rejecting the plaintiff's right to use of its property in a fair and profitable manner. Cf. Cape Ann Land Development Corp. v. City of Gloucester, 353 N.E.2d 645, 648 (Mass. 1976); Darswan, Inc. v. Capellini, et al, 397 N.Y.S.2d 415 (1977). Not only would this violate the whole spirit of the nature of special exceptions under our law, see A.P. Holding Corporation v. Planning Zoning Board, supra, but would raise serious state and federal due process questions.
(B)
The first reason given by the board for denying the plaintiff's application was:
 "The establishment of the additional convenience/snack shop use together with a gasoline station use would generate additional on site traffic. The proposed on site traffic flow pattern, with the only exit being on French Street, would cause backing up of traffic exiting the site resulting in improper and hazardous exiting from the site onto North Avenue."
It is difficult for the court to interpret the actual meaning of this language. It could be read to refer only to the alleged hazards presented by vehicles as they left the site and entered North Avenue directly from the site as opposed to exiting to French Street and then turning out onto North Avenue. CT Page 2116 Certainly the court reviewing the action of a zoning authority is confined to reviewing the reasons given by the agency and cannot find other unstated reasons that might justify its actions. See DeMaria v. Planning Zoning Commission, 159 Conn. 543, 541. But there was testimony presented by Mr. Kaleeda in which he said traffic congestion on French Street due to increased use of the site would lead certain individuals to drive in a hazardous and reckless way on the site in order to exit directly onto North Avenue and "they'll shoot out North Avenue" (Record, page 30).
Under these circumstances and given the fact that the defendant board is largely composed of lay people the court will give the language of the stated reason a broad reading. It will be assumed that when the board referred to "improper and hazardous exiting" it meant to describe the whole process of exiting from on site through the site and onto North Avenue thus expressing concern about hazardous on site conditions that would result from the granting of this application.
To put the discussion in context and to deal squarely with the purported hazard presented by the prospect of cars entering North Avenue directly from the site or indeed from French Street it would be instructive to examine the question of whether the portion of North Avenue in front of the subject parcel is an accident prone roadway.
Mr. Cimino testified about the accident history of this area and discussed it in more detail in the traffic study he submitted, see pages 14 et seq. of plaintiff's traffic study. Mr. Cimino compiled his information from the Connecticut Department of Transportation. For a three year period between January 1, 1988 and December 31, 1990 his figures reveal only two collisions occurred in the vicinity of the station at North and Housatonic — only one of which he would describe as occurring at the site. (Record p. 14). In the same three year period seven accidents occurred at North and Lindley but Mr. Cimino in his traffic study noted that that intersection is 200 feet east of the site. Much was made at the hearing by the opponents to the application about the fact that Cimino relied on state figures which require reporting only if a minimum amount of damage is caused. But the information submitted to the board by Attorney Luckart who represented the opposing neighbors and Mr. Kaleeda is somewhat confusing, contradictory, and indeed helpful to the plaintiff. Mr. Luckart referred to statistics provided CT Page 2117 to him by the Traffic Division of the Bridgeport Police Department. He told the board there were six accidents in 1990 at Lindley and North and seven in 1991. In 1990 there were five accidents at Housatonic and North but only two in 1991. At French and North there was one accident in 1990 and none in 1991. Mr. Kaleeda's traffic study and testimony differed from the information provided by the attorney who called him. Kaleeda also obtained his figures from the Bridgeport Police Department. For the only year he had figures, 1991, Kaleeda said there were ten accidents at Lindley and North but only two at Housatonic and North; he provided no information about North and French. The subject parcel is not at Lindley and North, that lies well to the east. Sufficient to say that Cimino, Luckart, and Kaleeda all provided information to the board that would indicate that the portion of North Avenue abutting the subject parcel is a low accident area.
The board's conclusion that approval of the plaintiff's application would result in on site traffic hazards and hazardous exiting onto North Avenue rests on several suppositions that have previously been discussed. Those for which the court has found support in the record are (1) the layout of the islands will direct traffic exiting the site toward French Street and (2) in all likelihood there will be an increase in on site traffic by some undetermined amount. The court has found no support in the record for the notion that the new station will be a traffic generator causing or increasing congestion on North Avenue. Also Mr. Kaleeda testified that traffic going east on North Street backs up to French Street when Lindley Street traffic is allowed to enter the North Avenue-Lindley Street intersection. This Kaleeda said would cause congestion on French Street with heavier on site usage of the subject parcel because traffic exiting French Street will have difficulty turning left (or east) onto North Avenue. As previously discussed, it is the court's opinion that Kaleeda's conjectures can be given little weight. He nowhere sets forth the frequency of the phenomenon he is either describing or predicting, whether it is a function of A.M., noon, or P.M. peak hour traffic, and how long the back up of traffic on North Avenue lasts for any one traffic cycle. Kaleeda says the backup occurs when the Lindley Street "phase" of traffic control is in operation — the court takes this to mean when traffic on North is stopped by traffic control so that the traffic on Lindley Street can proceed. However, nowhere in his traffic study or testimony does he set forth the length of this "phase" or relate it to CT Page 2118 traffic volume or street capacity. This would be crucial information if one were to have to make an intelligent estimate of the likelihood of congestion on French Street if the plaintiff's application were to be approved.
On these shaky foundations Mr. Kaleeda came to the conclusion, which the board adopted, that frustrated drivers to avoid the congestion on French Street will try to exit the site directly onto North Avenue. They will cut around the islands, drive between them after they've finished their business on the site, back out into North Avenue, and in fact will "zing out" into North Avenue and indeed "shoot out" into that benighted roadway (Record pp. 26, 30). This will produce both on site traffic hazards and encourage hazardous exiting into North Avenue.
But even these prospective drivers whom Kaleeda characterizes as "cowboys" must be credited with some common sense or at least method to their vehicular madness. Note that the North Avenue exit from the site lies to the east of the French Street exit. If as Kaleeda says turning right from French into North Avenue is "no problem" why would a driver exit the site and enter North Avenue going right when in doing so he would have to cross past traffic which is exiting from French Street and trying to go both east and west on North Avenue. More to the point why would a driver desiring to turn left onto North Avenue and go east exit directly from the site onto that roadway at a point where he or she is more likely to run into the backed up traffic on North Avenue that Kaleeda has talked about. That is, the North Avenue exit from the site puts the exiting vehicle closer to the Lindley Avenue intersection where the prophesied congestion finds its origin.
In any event Kaleeda bases his predictions about hazardous driving on this site on observations of drivers and assorted "cowboys" he made at another gasoline station having nothing to do with the subject parcel. He spent time at a station owned by Mobil at North Avenue and Park. There is nothing in the record to indicate how far the latter station is from the subject parcel. We are not told the exact placement or number of islands at this site or the number of pumps on each island. No information is provided about traffic conditions, volume or congestion at North and Park. Is Park a dead end street like French or is Park a heavily travelled high volume roadway? What is the traffic control at North and Park and the location and CT Page 2119 number of exits at the North and Park station? How does Mr. Kaleeda relate all of this information to various aspects or features of the subject parcel as it will be affected by the plaintiff's present application? The record is silent. It should finally be noted that the board apparently went to the North and Park station but according to the record only stayed from three to three and one half minutes. They did not go there to observe driving activity on and off site but merely to ascertain how many people entered the site just to use the convenience store.
Based on this record the court can find no support for the reasons given by the defendant board to deny the plaintiff's application for a special exception. It's action was arbitrary and the plaintiff's appeal is sustained.
CORRADINO, J.
APPENDIX
The court will discuss issues raised by the parties which are not central to the main discussion but are of some importance.
1. In its brief and at oral argument cited Rinaldi v. Zoning 
Planning Commission, 1990 WL 269380 written by the court for the well accepted propositions which the court alluded to in this decision that zoning authorities on matters regarding traffic safety can rely on their own knowledge and are free to reject expert testimony. But as the court said in Rinaldi a zoning authority can rely on its own knowledge "given evidence in the record raising this issue (traffic safety) and adequate notice" and under these circumstances "reject the conclusion of the plaintiff's traffic expert regarding traffic safety." In Rinaldi for example the plaintiff's expert response to concerns about traffic congestion could have rightly been interpreted by the board as quite unsatisfactory. He did not squarely confront the possibility of road congestion during seasons of the year when there might be more activity on the road system; all traffic surveys were done in January and December. In the memorandum of decision the court noted that the plaintiff's expert testified "seasonal activities wouldn't have much of an effect especially during the morning peak but `it might have an effect on the afternoon peak.'" The court went on to say that in light of the "reasonable question raised as to traffic CT Page 2120 congestion" by the plaintiff's own expert the zoning authority could have found the expert did not allay their concerns over this issue. In the case now before the court the record doesn't raise a reasonable question or concern about traffic safety or congestion.
2. In its brief the plaintiff concludes by saying the court should look at bias and motive as the real reason for a decision the plaintiff contends is not supported by the record. The plaintiff notes that people who spoke against the application at the hearing were potential competitors of the proposed snack store. The board consists of elected members.
What a reviewing court is supposed to do with this information is never spelled out by the plaintiff. The plaintiff at the hearing never raised issues of bias or prejudice on the part of the board members. There is no claim that the hearings were conducted unfairly. Cf. Marmah, Inc. v. Greenwich, 176 Conn. 116, 118 (1978). The only relevant motives are those of the members of the zoning board and there is nothing to indicate that they didn't try to do their job in a fair and responsible manner. The board had no control over the fact that competitors chose to speak at the hearing and just because they were competitors does not mean that any claims or factual allegations they made were ipso facto incorrect or irrelevant. Cf. Primerica v. Planning Zoning Commission, 211 Conn. at page 97. In almost every case where a zoning application is disputed before local zoning boards neighbors or competitors express their views; this can hardly be used as a reason to then later question the fairness or validity of a decision adverse to the applicant.
3. The plaintiff interprets T.L.C. Development v. Planning 
Zoning Commission, 215 Conn. 527 (1990) as basically overturning special exception zoning regulations throughout the state by holding traffic considerations can't be a criteria in granting or denying such applications. T.L.C. Development, involved a site plan for a shopping center — a use already permitted and, a use which the legislature in setting up the zone had to know would generate traffic. Thus, the court held the site plan couldn't be denied because of traffic considerations.
But as Rathkopf notes the special exception procedure is often used for "gas stations or other traffic generating uses which are apt to cause traffic congestion or hazards if not CT Page 2121 properly located." Law of Zoning Planning, 59.01, "Traffic Conditions and Zoning, page 59-5. Nothing in T.L.C. Development prevents regulations such as are set forth in the Bridgeport zoning code to control traffic problems that might be created in particular zones by uses such as gas stations. The use of the special exception procedure to exercise such control is a basic objective of zoning law.